[No. A081949. First Dist., Div. Three. Sept. 30, 1998.]

In re the Marriage of VALERIE M. EDLUND and GREGORY T. HALES.
VALERIE M. EDLUND, Respondent, v.
GREGORY T. HALES, Appellant.

**COUNSEL**

Russell J. Hanlon for Appellant.

Sucherman & Insalaco and Michelene Insalaco for Respondent.

---

**OPINION**

**PHELAN, P. J.**—In this expedited appeal, Gregory T. Hales challenges an order under which his ex-wife, respondent Valerie M. Edlund, was allowed to move to Indiana with their daughter, Natalie. The challenged order modified an existing order of joint custody, under which Edlund had primary physical custody but Hales had regular visitation with Natalie. We issued a writ of supersedeas to maintain the status quo pending decision on the merits of Hales's claims of error. Having carefully reviewed the record on appeal, and the parties' briefs and arguments, we conclude the trial court did not abuse its discretion in issuing the move-away order, or in establishing a schedule for visitation after the move. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Hales and Edlund were married in June 1991. At the time, Edlund was working full-time as a dental hygienist, Hales was working as a real estate agent, and they were living in a house in Boulder Creek, which they purchased together shortly before they were married. Natalie was born in September 1994, but her parents separated approximately seven months later, in April 1995. In May 1995, Edlund and Natalie moved into her aunt's home in San Carlos. In or about June 1995, Hales moved to Santa Cruz and began a relationship with Karen B., a 17-year-old high school student. He began living with Karen in June 1996, when she was entering the University of California at Santa Cruz as an 18-year-old freshman. In March 1996, Edlund began a relationship with Brett B., to whom she became engaged in April 1997.

A. *The Dissolution Proceedings.*

Edlund filed a dissolution petition in March 1996 in Santa Clara County Superior Court. In a marital settlement agreement dated July 22, 1996, Hales and Edlund agreed they would share joint legal custody of Natalie, but Edlund would have primary physical custody. At the time, Edlund was working full-time as a dental hygienist, and Hales claimed he could not assume equal responsibility for his daughter because of his work schedule at a fitness club. Thus, he agreed to a schedule under which he would have custody of Natalie only every other weekend, with additional time on holidays. In the settlement agreement, the parties further declared: "The parents stipulate that it is in Natalie's fundamental best interest, both now and in the future, to have frequent and continuing contact with both parents. So as to ensure that Natalie shall continue to have frequent and continuing contact with both parents, [Edlund] and [Hales] shall not reside outside of Santa Cruz County, Santa Clara County and/or San Mateo County." The judgment of dissolution was entered on October 18, 1996. Hales changed jobs in February 1997, going back into real estate sales.

B. *Edlund's Application for a Move-away Order.*

In April 1997, the parties filed a stipulation and order for a change of venue to San Mateo County, and the case was transferred effective June 17, 1997. A month later, on July 17, 1997, Edlund filed an application for a modification of the existing custody order, seeking permission to move to Indiana with Natalie to join her fiancé, Brett, who had already moved to Indianapolis pursuant to a transfer of his job with United Airlines. Edlund also sought the court's assistance in modifying the existing visitation schedule in light of her plan to move.

In a declaration in support of this application, Edlund stated that she had been discussing with Hales her desire to return to the Midwest to live since they separated in April 1995, but formally presented Hales with a plan to do so on January 23, 1997. She explained her reasons for wanting to move, as follows: "In April I became engaged to be married. My fiance works for United Airlines and has been transferred to Indiana. He will be moving the third week of July, 1997. Our plans are for me and Natalie to join him shortly thereafter. We plan to marry in the midwest, build a life and home together, and to have more children. This is a great opportunity for my fiance, as United's headquarters are in Chicago and his ability to 'climb the ladder' is much greater in the midwest than in the Bay Area. Further, our family can live much better on his salary in the midwest than in California. . . . [¶] I moved to California in July, 1989 to be with Greg. [¶] I was

raised in the midwest. I lived there from age 10 until I was 22 years old. I consider it my home. My sister, nieces and parents live in the midwest. I would like to live near them so that I could see more of them and so that Natalie gets to know her grandparents and cousins. I also like the pace and style of living in the midwest. . . . [¶] Greg pays me $400 per month in child support (which he told me is actually paid by his father). He is supposed to pay me more if he closes escrows, and I haven't received any money, so presumably Greg has not sold any houses. I am a dental hygienist. I have enough money to pay my bills each month, but that's it. [¶] I do not want to continue to struggle. I want to provide a good standard of living for Natalie and I want to be able to afford to have other children so that Natalie has siblings. I can't afford that here. Natalie and I currently reside with my aunt in a 1200 square foot home. I have no money for a down payment on a home and do not envision how I could ever afford a nice home in the Bay Area. [¶] My fiance and I could afford to buy a nice home in the midwest. A home in a cul-de-sac where children play freely outdoors and as parents we can feel safe about letting them play. Furthermore, the public schools in Indiana are excellent, as compared to California public schools, which are among the worst in the country. Neither Greg nor I can afford private schooling costs. . . . [¶] If I could afford it, I would like to stay home more and raise Natalie rather than send her to daycare most days of the week. As it is [now], in order to make ends meet, I work 4 long days a week right now. [¶] With a move to the midwest, my fiance and I could afford for me to stay home more and raise Natalie." (Underscoring in original.)

Hales opposed Edlund's application, filing a responsive declaration in which he asked for a trial de novo on the issue of custody, and requested sole custody of Natalie if Edlund were to move away: "If Valerie wants to move to Indiana to be with her fiance, then she should certainly be permitted to move there, however, in that event, I would ask the Court to change the primary physical custody of Natalie to me." Hales also requested appointment of an evaluator.

C. *The First Mediation Session.*

On August 6, 1997, the matter was sent to mediation after which the mediator, Ana Morante, submitted a lengthy and thoughtful report in which she found that "although the parents have joint custody, the mother has been the primary parent for the child." The mediator further found that "the mother does not appear to have negative motives for the move, i.e., [to] frustrate contact between the father and the child." Indeed, Morante found Edlund to be "very serious about her intention to move," and "very clear about the benefits this would bring for her," apparently crediting evidence

that the purpose of the move was to join her fiancé who had already been transferred to Indiana and to establish a home in a geographic region with a lower cost of living such that she could afford to stay at home with her children rather than working full time outside the home. And, although Morante further found that Natalie is "very bonded to both parents and that both of them are very invested in having the child a significant amount of [the] time," and that "the relationship with the father could suffer," she concluded that the child's relationship with Edlund was "more important." Morante thus concluded that she would allow the move as long as Edlund could show she will be able to provide a stable environment for the child in Indiana and will help the child "maintain as close a relationship as possible with the father through phone calls, pictures, videos, and more time during the holidays." However, the mediator also suggested she would entertain additional information Hales might bring which would indicate the move would be detrimental to Natalie. Morante set the matter for mediation review on September 3, 1997.

### D. *The First Hearing on Edlund's Application for a Move-away Order.*

On August 14, 1997, the trial court held a hearing at which the issue was "whether the parents had a joint timeshare arrangement sufficient to warrant a trial de novo on custody." The court expressly found they did not, recognizing "that there were geographical constraints which limited [Hales's] visits." The trial court also found that Hales had not made a sufficient showing of frustration of visitation, but indicated that such a showing "could warrant a de novo review." Accordingly, the court granted Edlund's request for an order allowing her to move with Natalie to Indiana. The court further ordered the parties back to mediation to bring information the mediator had requested, and to work out a schedule for visitation following the move.

### E. *Hales's Motion for a New Trial and the Mediation Review.*

Seizing upon the trial court's comment about "frustration of visitation," Hales filed a motion for a new trial on the ground of "newly discovered evidence" relating to that issue which, he claimed "could not, with reasonable diligence, have been produced at trial." In support of his new trial motion, which was September 12, 1997, Hales submitted a declaration stating as follows: "After the hearing on August 14, 1997, wherein the court rendered its decision, I contacted Cathy Bonomi, who was a child care provider who had cared for our daughter Natalie for almost two years. I was surprised to learn that [Edlund] had told Cathy Bonomi that she would do anything to get back at me for divorcing her, including taking my daughter

away from me." Neither Hales nor his attorney explained why this evidence—which consisted of a letter from Bonomi, a person well known to Hales, containing statements made on "numerous occasions" during the preceding four to five months—could not, with reasonable diligence, have been provided to the court at the previous hearing. Edlund opposed Hales's motion for a new trial on the grounds, inter alia, the "evidence" from Bonomi was not "new," and could have been discovered with reasonable diligence in time to present it at the August 14 hearing.

Hales was apparently encouraged at the prospects for his motion for new trial[1] when, after the mediation review on September 3 at which he presented a facsimile copy of Bonomi's letter, Morante issued a second report in which she found that, *if Bonomi's letter were true*, it suggests "it would be very damaging for the child to be removed from the father in an attempt to hurt him," and that "visitation between the father and the child could also be interfered [*sic*] in the future." The mediator also said she was concerned about some statements Bonomi had made about "controlling behavior with the child" and "the child's regressive behavior and tendency to withdraw [into] herself." Accordingly, in her second report, Morante recommended a psychological evaluation for Natalie and her parents.

On September 26, 1997, the trial court granted Hales's motion for new trial, referred the matter for an evaluation, and ordered Edlund not to remove the child from the state pending completion of the evaluation. The parties stipulated to the appointment of Dr. Kenneth Perlmutter as the evaluator, pursuant to Evidence Code section 730 and Code of Civil Procedure section 638, subdivision 2.

### F. *Dr. Perlmutter's Evaluation and Report.*

After conducting a lengthy and thorough evaluation, Dr. Perlmutter completed his report on December 17, 1997. He completely disregarded Bonomi's letter and input from a personal interview he conducted, finding that Bonomi "has strong negative personal feelings for [Edlund]" and "is very likely biased against [her]." Dr. Perlmutter also found Bonomi to have "a clear and definite bias" against "any parent trying to move the residence of a child away from another parent." Thus, Dr. Perlmutter concluded there was no evidence to support Hales's claim that the move was intended to frustrate his visitation with Natalie.

Dr. Perlmutter found "a strong and close emotional bond" between Natalie and both her father and mother. However, he found that Edlund "has done

---

[1]In his reply papers in support of the motion for new trial, Hales's attorney claimed the motion had been "validated" by Morante.

the bulk of the day to day parenting of Natalie," that it "is obvious that Natalie is primarily emotionally bonded to her mother,"[2] and that Edlund was sincere about her reasons for moving. Dr. Perlmutter explained: "All the evidence I have points to the fact that [Edlund] has been the primary provider and caretaker of Natalie. She has organized Natalie's life and cared for Natalie in a good and very appropriate way. There is no doubt that [Edlund] is imminently [*sic*] qualified to take care of Natalie in the same way she has in the past. [Edlund] did not express any anger or upset with [Hales]. She acknowledged the importance of his role as Natalie's father. She endorsed their relationship and believes it is paramount for them to continue to have a strong bond. There is no evidence that [Edlund] has frustrated or endeavored to limit or prohibit [Hales's] custodial time with Natalie in the past. [Hales] has not had more time with Natalie because he has not taken full advantage of the time he could have had. I believe that [Edlund] seeks to move because she genuinely believes a move is in her and Natalie's best interest. But the practical implication of the move is that if granted it will change the nature of the father-daughter relationship."

As to Natalie, Dr. Perlmutter found her to be a "happy, playful, relaxed and pleasant child," with "no signs that she suffers from any kind of emotional or psychological difficulties." He considered the only reported problem—that Natalie had been waking up in the middle of the night and refusing to return to her bed—to be "situational and directly related to the problems between the parents which are related to the long standing and drawn out nature of the custody dispute." He was satisfied that the parents were "working together and with Natalie in a productive and positive fashion to help Natalie with the sleep problem," and were developing "some new effective strategies that have been helpful."

Dr. Perlmutter clearly found that it would not be appropriate to change the parties' custody arrangement such that Hales would become the primary custodial parent. He noted Hales's requests for equal physical custody, both in the past and in the event Edlund should stay in the Bay Area, but found them not to be entirely realistic. Dr. Perlmutter further observed how Hales "readily admitted that he has not taken full advantage of the additional weekly time he could have had with Natalie." Indeed, although Hales claimed his return to a real estate job was a "good fit" for expanding his role in Natalie's life, Dr. Perlmutter noted it had been approximately 10 months since Hales gave up his job at the fitness center but that he had "not taken more than a minimal amount of the additional time he could have with

---

[2]However, in an internally *inconsistent* portion of his report, Dr. Perlmutter also stated that there *is* "no evidence to suggest that Natalie is more closely emotionally bonded to her mother or her father."

Natalie," and that he did not have a good reason for failing to do so. Hales also admitted his idea of moving from Santa Cruz to Santa Clara County and to spend more time with Natalie, was "not a realistic plan."

Dr. Perlmutter also evaluated Hales's parenting skills, finding them to be "appropriate but not particularly sophisticated." While he gave Hales credit for having "stepped up his efforts to be the best possible parent he can be," and found that Hales can "take reasonably good care of his daughter," Dr. Perlmutter also found "evidence that he would experience great difficulty if he was to become the full time provider." Indeed, Dr. Perlmuttter found Hales's "skills in taking care of Natalie for an extended period of time are untested" because the pattern since the separation had been that Hales "had a minimal role in taking care of Natalie on a day to day basis." The reason for this, Dr. Perlmutter explained, was Hales's chosen lifestyle: "I have no specific concerns about Karen. I do have some concerns about Karen's and [Hales's] relationship. I am unclear how stable this relationship is now and whether it will stand the test of time. [Hales] and Karen are at very different developmental stages in their lives and despite Karen's maturity I believe there is some reasonable probability that this will not be a permanent relationship. This is not a condemnation of [Hales] or Karen or their relationship. However, I do believe that when this custody matter is resolved that [Hales's] relationship with Karen may ultimately be a limiting factor in his ability to take on the kind of parenting role he claims to desire. I believe [Hales's] work and relationship with Karen are the true reasons he has not taken more time with Natalie in the past."

Dr. Perlmuttter also expressed some concern about the stability of Edlund's relationship with her fiancé, Brett, and the possibility that Brett might come to resent Natalie because of the ways his life has been changed as a result of the custody dispute. However, Dr. Perlmutter found no specific evidence that Edlund's relationship with Brett was problematic, and appeared to credit a statement by Brett, saying he "has a close relationship with Natalie and cares for her dearly."

Finally,. in his "Summary and Assessment," Dr. Perlmutter set forth his "salient conclusions," as follows: "[Edlund] has been the primary parent and caretaker for Natalie. I would not recommend a change of custody at this time. Natalie is emotionally attached to both parents, but the primary attachment is to her mother. At her present stage of development Natalie is likely to be substantially negatively impacted by long periods of separation from both parents. [Edlund] presents no substantive, urgent or compelling reason to move to Indiana. [Edlund's] request to move is not a direct attempt to frustrate father's relationship with the child but it will cause that practical

effect. There is no evidence whatsoever that [Edlund] has acted in the past to frustrate father's custodial time with the child." Dr. Perlmutter added that he found Edlund's decision to move to be "a puzzling one" and her belief in a better material life in Indiana to be "debatable," and wondered whether any conceivable financial gain would be worth the separation of Natalie from her father and the additional costs of a long-distance relationship.

Dr. Perlmutter continued: "It is clear to the undersigned that the best possible scenario for Natalie would be for her parents to remain in the bay area, sort out their lives and allow her to have the benefit of the love and attention of both parents and extended families. There is no doubt in my mind that Natalie will be significantly negatively impacted by a move to Indiana which separates her from her father and requires lengthy cross[-]country travel. Natalie will grow up being fathered primarily by a step-father and [Hales] will not be involved in the primary parenting or typical parent-child activities as she grows older. However, it is also clear that [Edlund] has done the bulk of the day to day parenting of Natalie. It is obvious that Natalie is primarily emotionally bonded to her mother and that a lengthy separation between them would not be good for Natalie. This will be true if Natalie moves to Indiana and is separated from her mother for long periods when she visits her father. The sad part of this is that because of the adults' needs Natalie will suffer."

Dr. Perlmutter also summarized his view of Hales position: "[Hales] is worried now because he feels threatened by losing his daughter. He has received the wake up call too late. While I believe that in the past he has asked [Edlund] to change the schedule so he could have more time I can understand why [she] never acquiesced. [Hales's] behavior never showed that he would take advantage of having more time with his daughter. [Hales's] life style (a busy, fast moving job and a new developing relationship with a young woman) is not well suited to spending long periods with a young child. [Hales] has placed other priorities above or equal to his daughter. I don't hold this against him, it is simply a fact."

Conspicuously missing from Dr. Perlmutter's report is any recommendation to the court about an appropriate disposition of Edlund's request for a move-away order. Indeed, Dr. Perlmutter specifically declined to provide any overall assessment of which action would be in Natalie's best interests, saying: "I do not believe I should be the person to decide whether [Edlund] is given permission to move this child to Indiana. As there are clear legal issues in this regard the final decision should be made by an appropriate judicial officer." Dr. Perlmutter candidly stated he was "unsure" about the proper disposition.

### G. *The Second Hearing on Edlund's Request for a Move-away Order.*

On January 21, 1998, the trial court conducted a hearing on Edlund's renewed request for a move-away order. The court found Dr. Perlmutter's report to be very helpful and of high quality, and agreed that Bonomi's letter should be disregarded. Although the court voiced disapproval of her reasoning and values, it nevertheless found that Edlund had "good stated reasons for the move," that there was no evidence of "frustration of visitation," that Edlund was the primary custodial parent, and that she should be allowed to move with Natalie, as follows: "I need to express the frustration that Miss Edlund just doesn't get it. That she doesn't seem to understand that it takes more than a good school district and a good housing situation to raise a child. She seems disconnected, if you will, from her child's emotional needs. Frankly, if as fine a professional as Dr. Perlmutter can't bring her to some sensitivity about it, I don't expect this court will be able to. [¶] I need to state on the record she just doesn't really seem to appreciate what's happening to this child that there is more to life than social economic status and her child is getting a lot of good social economic status, if you will. It doesn't seem to be getting her mother to emotional needs particularly a mother who appreciates what would happen to this child if she were separated from her father. [¶] That having been said, the motion for a new trial . . . was made on the basis . . . that this was—this proposed move arose out of a desire to frustrate visitation. Dr. Perlmutter's report is quite clear that that is not the case. I frankly think that the letter of Kathy [Bonomi] needs to be disregarded by the court. I do not believe that the primary motive for this move is a desire to frustrate visitation. I believe it is a very short sighted and materialistic view [of] what is good for her child. [¶] So the question arises whether this court under the current state of the law in California is entitled to second-guess that judgment. The fact that she's not a better parent in terms of deciding what the emotional needs of her child are is not something I can second-guess. It is not something that I can substitute my judgment for. If I were to substitute judgment, I would say to her, your child emotionally needs to stay in California. The law does not, as far as I read the law, entitle me to do that. [¶] So to cut to the chase the court is going to allow her to move to Indiana with really and I need to state this on the part of all of us who do family law with grave misgivings about her judgment in this case. She is a good mother who is bonded to this child on a daily basis and able to care for this child. I think she is extraordinarily shortsighted in her decision. The decision is well founded on the kind of social economic factors that she has brought forward to this court. So I am not going to second-guess those factors. [¶] The court finds that she has good stated reasons for the move in terms of her desire to place this child in a residential community, in a school district which she feels is appropriate for the child. That there are some

connections to family in the midwest which the child could enjoy. Clearly, there are connections to family which the child will not be able to enjoy and that is a loss to this child. [¶] The court also is basing its decision on a finding based on Dr. Perlmutter's report that the child has a strong attachment to both parents but that this mother has been the primary custodian parent. This court specifically rejects, if you will, the whimsical test that *Cassady*[3] presupposes. I do not believe her decision is based on whimsy. I think it is a very well fair thought through in her own framework. My objection is that her framework is limited."

## II. DISCUSSION

Hales raises two issues on appeal. First, although he recognizes that the standard of review for a move-away order is the "deferential abuse of discretion" test (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473] (*Burgess*)), he claims a trial court is *required* to enjoin the move if there is any evidence that the move will have a significant negative impact on or "prejudice the . . . welfare of the child" (Fam. Code, § 7501).[4] Even if the move-away order was a proper exercise of the trial court's discretion, however, Hales further contends that the court abused its discretion by reducing the total amount of visitation he would have with Natalie in California after the move. As we will discuss, we reject these arguments, both of which are premised on a misreading of *Burgess*.

### A. *The Trial Court Did Not Abuse Its Discretion by Allowing Edlund to Move With Natalie to Indiana.*

At issue here, as in *Burgess, supra,* 13 Cal.4th 25, is a motion for modification of an existing custody order, brought by a parent who is the primary custodial caretaker of the subject child and who wishes to move away from the geographical area in which the child's other, noncustodial parent resides.[5] Although the *Burgess* court had before it only a request to modify an initial, temporary custody order, and to issue a permanent custody order under which the custodial parent would be allowed to move with the children to a neighboring city, the Supreme Court chose to analyze move-away orders generally. (*Id.* at p. 37, fn. 8.) Thus, the *Burgess* court included

---

[3] In context, it is clear the court was referring to *Cassady* v. *Signorelli* (1996) 49 Cal.App.4th 55 [56 Cal.Rptr.2d 545], a case we discuss in part II.A., *post.*

[4] All further statutory references are to the Family Code unless otherwise indicated.

[5] There is no claim and no evidence that the parties ever shared joint physical custody of Natalie, either under an existing order or in fact. Such cases are subject to de novo review of the custody decision, and are governed by section 3087, which provides that the joint custody order " 'may be modified or terminated upon the petition of one or both parents or on the court's own motion if it is shown that the best interest of the child requires modification or termination of the order.' " (*Burgess, supra,* 13 Cal.4th at p. 40, fn. 12; see also *Brody* v. *Kroll* (1996) 45 Cal.App.4th 1732, 1736-1737 [53 Cal.Rptr.2d 280].)

an extended discussion of the law governing the situation presented in this case: a custodial parent's request for a move-away order after there has been a judicial determination[6] of a permanent custody arrangement. (*Id.* at pp. 37-40.)

As to modifications of both initial and permanent custody orders, the *Burgess* court focused its analysis on the "presumption in favor of stability and continuity in the child's primary custodial relationship." (13 Cal.4th at p. 39; see also *Burchard* v. *Garay* (1986) 42 Cal.3d 531, 541 [229 Cal.Rptr. 800, 724 P.2d 486, 62 A.L.R.4th 237].) The *Burgess* court elaborated on this concept, as follows: "As we have repeatedly emphasized, the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining ongoing custody arrangements. [Citations.]" (13 Cal.4th at pp. 32-33.) However, the *Burgess* court also went to great lengths to harmonize this well-established presumption, in the move-away context, with the important public policies embodied in various sections of the Family Code, including: section 3011, which sets forth factors relating to the "best interest" of the child that a trial court should consider in making any custody determination; sections 3020, subdivision (b), and 3040, subdivision (b), which reflect the public policy to assure "frequent and continuing contact" between children and both of their parents after separation and divorce; and section 7501, which establishes the right of a parent entitled to custody " 'to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child.' " (13 Cal.4th at pp. 29, 31-36, 38.)

The *Burgess* analysis was formulated and adopted in light of the court's view of the realities of everyday life in contemporary American society: "As this case demonstrates, ours is an increasingly mobile society. Amici curiae point out that approximately one American in five changes residences each year. (See Bruch & Bowermaster, *The Relocation of Children and Custodial Parents: Public Policy, Past and Present* (1996) 30 Fam.L.Q. 245, 248.) Economic necessity and remarriage account for the bulk of relocations. (*Id.* at pp. 248-249.) Because of the ordinary needs for *both* parents after a marital dissolution to secure or retain employment, pursue educational or career opportunities, or reside in the same location as a new spouse or other family or friends, it is unrealistic to assume that divorced parents will permanently remain in the same location after dissolution or to exert pressure on them to do so. It would also undermine the interest in minimizing

---

[6]A recent case has held that where, as here, the custody arrangement was established pursuant to a stipulation of the parties, it nevertheless falls within the scope of *Burgess*. (*In re Marriage of Biallas* (1998) 65 Cal.App.4th 755, 760-762 [76 Cal.Rptr.2d 717].)

costly litigation over custody and require the trial courts to 'micromanage' family decisionmaking by second-guessing reasons for everyday decisions about career and family." .(*Burgess, supra,* 13 Cal.4th at pp. 35-36, fn. omitted, italics in original.)

To eliminate confusion about what the *Burgess* court actually held—a matter of sharp dispute between the parties—we set forth at length our Supreme Court's discussion of the law governing a move-away order issued as a modification of a permanent custody order:

"Ordinarily, after a judicial custody determination, the noncustodial parent seeking to alter the order for legal and physical custody can do so only on a showing that there has been a substantial change of circumstances so affecting the minor child that modification is essential to the child's welfare. [Citation.] As we have explained: 'The [changed circumstance] rule requires that one identify a prior custody decision based upon circumstances then existing which rendered that decision in the best interest of the child. The court can then inquire whether alleged new circumstances represent a significant change from preexisting circumstances, requiring reevaluation of the child's custody.' [Citation.]

"We conclude that the same allocation of the burden of persuasion applies in the case of a custodial parent's relocation as in any other proceeding to alter existing custody arrangements: '[I]n view of the child's interest in stable custodial and emotional ties, custody lawfully acquired and maintained for a significant period will have the effect of compelling the noncustodial parent to assume the burden of persuading the trier of fact that a change [in custody] is in the child's best interests.' [Citation.]

"Similarly, the same standard of proof applies in a motion for change in custody based on the custodial parent's decision to relocate with the minor children as in any other matter involving changed circumstances: '[O]nce it has been established [under a judicial custody decision] that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest.' [Citation.]

"The showing required is substantial. We have previously held that a child should not be removed from prior custody of one parent and given to the other ' "unless the material facts and circumstances occurring subsequently are of a kind to render it essential or expedient for the welfare of the child that there be a change." ' [Citation.] *In a 'move-away' case, a change of custody is not justified simply because the custodial parent has chosen, for any*

*sound good faith reason, to reside in a different location, but only if, as a result of relocation with that parent, the child will suffer detriment rendering it ' "essential or expedient for the welfare of the child that there be a change." '* [Citation.]

"This construction is consistent with the presumptive 'right' of a parent entitled to custody to change the residence of his or her minor children, unless such removal would result in 'prejudice' to their 'rights or welfare.' (Fam. Code, § 7501.) ▆ *The dispositive issue is, accordingly, not whether relocating is itself 'essential or expedient' either for the welfare of the custodial parent or the child, but whether a change in custody is ' "essential or expedient for the welfare of the child." '* [Citations.]

"At the same time, we recognize that bright line rules in this area are inappropriate: each case must be evaluated on its own unique facts. Although the interests of a minor child in the continuity and permanency of custodial placement with the primary caretaker will most often prevail, the trial court, in assessing 'prejudice' to the child's welfare as a result of relocating even a distance of 40 or 50 miles, may take into consideration the nature of the child's existing contact with both parents—including de facto as well as de jure custody arrangements—and the child's age, community ties, and health and educational needs. Where appropriate, it must also take into account the preferences of the child. (Fam. Code, § 3042, subd. (a) ['If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court shall consider and give due weight to the wishes of the child in making an order granting or modifying custody.'].)" (*Burgess, supra,* 13 Cal.4th at pp. 37-39, italics added, fns. omitted.)

To summarize, then, the questions for decision with respect to a custodial parent's request for a move-away order are: (1) whether the custodial parent has sound, good faith reasons for the move (*Burgess, supra,* 13 Cal.4th at pp. 36, fn. 5, & 38); and (2) if so, whether the noncustodial parent can show that, as a result of the move, the child will suffer detriment rendering it essential or expedient for the welfare of the child that there be a change of custody. (*Id.* at pp. 37-38.) The showing of "changed circumstances" required of the noncustodial parent must consist of more than the fact of the proposed move. (*Ibid.*; *In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 140-141 [61 Cal.Rptr.2d 559].) The trial court's decision on a request for a move-away order must be upheld unless it constitutes an abuse of discretion. (*Burgess, supra,* at p. 32, citing *Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202, 208 [259 P.2d 656].) "The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child.

We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked." (*Burgess, supra,* at p. 32, citing *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

 As the trial court expressly found based upon substantial evidence, Edlund is the primary caretaker and physical custodian of Natalie, and there was no true joint custody arrangement. Moreover, as the trial court further found—not once, but *twice,* in agreement with both the mediator and psychological evaluator—this is not a case in which the custodial parent's decision to relocate is "whimsical," or designed "simply to frustrate the noncustodial parent's contact with" the child. (See *Burgess, supra,* 13 Cal.4th at p. 36, fn. 6.) Rather, the court expressly found that Edlund's decision was "well founded on the kind of social economic factors that she has brought forward to this court." In this regard, although the court did not specifically mention it, Edlund had explained that she wanted to be able to move to a location with a lower cost of living, where she and her husband-to-be could have more children and could afford to have her give up her job and stay home to care for Natalie and any half-siblings that might come along. The trial court further found that Edlund had "good stated reasons for the move in terms of her desire to place this child in a residential community, in a school district which she feels is appropriate for the child." Moreover, besides Edlund's fiancé, who had already been transferred to a new job in Indiana, the trial court also found "some connections to family in the midwest which the child could enjoy." This and other evidence in this record is sufficient to support a finding that Edlund had sound, good faith reasons for the move. (*Id.* at p. 36, fn. 5.)

This is not a case, as was *Cassady* v. *Signorelli, supra,* 49 Cal.App.4th 55, in which the trial court found the custodial parent's reasons for seeking a move-away order were "whimsical," and were "simply to frustrate the father's relationship with" the child. (*Id.* at pp. 59, 60; see also *Ruisi* v. *Thieriot* (1997) 53 Cal.App.4th 1197, 1206, fn. 6 [62 Cal.Rptr.2d 766] [distinguishing *Cassady* on this basis].) Such a case falls within an "exception" to the rule of *Burgess.* (13 Cal.4th at p. 36, fn. 6.) The trial court, after extensive evidentiary proceedings, expressly found there was no credible evidence of such a motive on Edlund's part in this case.[7] Of course, the trial court clearly disapproved of Edlund's reasoning, chiding her for being "short

---

[7]Moreover, in *Cassady,* the trial court exercised its discretion to disallow the custodial parent to move the child's residence, and this court upheld that determination as supported by substantial evidence and within the trial court's discretion. (*Cassady* v. *Signorelli, supra,* 49 Cal.App.4th at p. 59.) Thus, *Cassady* supports Edlund's argument that the decision in a move-away case is entrusted to the sound discretion of the trial court and must not be set aside unless the trial court's decision is not supported by substantial evidence or otherwise constitutes an abuse of discretion.

sighted" and "materialistic" for wanting to move to Indiana. Nevertheless, as we have observed, the court expressly—and properly—concluded that Edlund's decision was "well founded" and based on "good stated reasons." On this record, we believe Edlund presented ample, credible evidence that she had a "sound 'good faith' reason[s]" (*Burgess, supra,* 13 Cal.4th at p. 36, fn. 5) for seeking to relocate with Natalie. "Once the trial court determined that the mother did not relocate in order to frustrate the father's contact with the minor children, but did so for sound 'good faith' reasons, it was not required to inquire further into the wisdom of her inherently subjective decisionmaking." (*Ibid.*)

It was, therefore, incumbent upon Hales to present evidence sufficient to support a finding that, as a result of the move, Natalie will suffer detriment rendering it essential or expedient for the welfare of the child that custody should be transferred to him. (*Burgess, supra,* 13 Cal.4th at p. 38.) This he has failed to do.

It is true that Dr. Perlmutter's report contained some evidence of detriment, in the form of conclusory assertions that Natalie would be "significantly negatively impacted" by the separation from her father and the regular, lengthy cross-country travel should Edlund move with her to Indiana. Apparently, Dr. Perlmutter believed the detriment to Natalie would result from: (1) "being fathered primarily by a step-father"; and (2) Hales's not being "involved in the primary parenting or typical parent-child activities as she grows older." Hales also relies on evidence that Dr. Perlmutter recommended psychotherapy for Natalie upon moving to Indiana.[8]

So long as Edlund continues in her well-established role of "primary custodial parent," and assuming she remarries as planned, the first type of "detriment" predicted by Dr. Perlmutter will be realized whether or not the court authorizes a move. As to the second type of "detriment" cited by Dr. Perlmutter, it may well have been an abuse of discretion for the trial court to have assumed Hales would, contrary to *his* well-established pattern of behavior, in fact become "involved in the primary parenting" of his daughter and, on that basis, to have denied Edlund's request for a move-away order. On the contrary, as Dr. Perlmutter himself repeatedly noted, Hales had never played more than a "minimal role" in Natalie's day-to-day care, he had

---

[8]Dr. Perlmutter also repeatedly used language indicating he believed Edlund had to prove the move was "necessary." Of course, such a premise runs directly contrary to *Burgess.* (13 Cal.4th at pp. 29, 33-34.) For example, he stated that Edlund "presents no substantive, urgent or compelling reason to move to Indiana." To the extent this was a premise from which Dr. Perlmutter was reasoning, and he was weighing the benefits of the move (or, as he saw it, the complete lack thereof) against the harm Natalie would suffer from separation from her father, we must discount his comments about "detriment."

"placed other priorities above or equal to his daughter," and his "behavior never showed that he would take advantage of having more time with his daughter."

More importantly, we cannot imagine a case in which a child with any meaningful relationship with the noncustodial parent would not be "significantly negatively impacted" by a good faith decision by a custodial parent to move, over the noncustodial parent's objection, to a distant location. But if the evidence of "detriment" contained in Dr. Perlmutter's report were sufficient to support denial of a move-away order in this case, no primary custodial parent would *ever* be able to secure such an order. A reversal in this case would run contrary to *Burgess,* where our Supreme Court noted that ". . . the interests of a minor child in the continuity and permanency of custodial placement with the primary caretaker will most often prevail" (13 Cal.4th at p. 39), and that the showing required to overcome this presumption is "substantial" (*id.* at p. 38). It would also fly in the face of the emerging trend of decisions by which California courts have approved long-distance relocations, and those decisions have been upheld on appeal on records similar to the instant one. (*In re Marriage of Condon* (1998) 62 Cal.App.4th 533, 539-540, 541, fn. 9, 550-554 [73 Cal.Rptr.2d 33] [allowing mother to move with sons to Australia, where mother had extensive family ties and could become self-supporting, despite fact father had "strong and bonded relationship with his sons" and offered expert testimony from a psychologist about "Parental Alienation Syndrome"; trial court carefully crafted visitation order "to minimize adverse effects of the move on the father-child relationship"]; *In re Marriage of Whealon, supra,* 53 Cal.App.4th at pp. 137-141 [allowing mother to relocate to New York with infant son despite fact father had extensive weekly visitation with the child]; see also *In re Marriage of Biallas, supra,* 65 Cal.App.4th at pp. 762-764 [reversing denial of mother's request for move-away order where mother had physical custody; trial court did not give sufficient weight to presumption favoring continuation of existing custodial arrangement, and the only showing of detriment related to "negative effects" of move on visitation with father and paternal grandmother].)

That Dr. Perlmutter recommended psychotherapy also suggests there will be some "detriment" to the child from the move, but does not really add anything to Dr. Perlmutter's other statements about the "negative impacts" of relocation. Rather, the suggestion that Edlund should find an appropriate psychotherapist was simply one of his "recommendations" for helping Natalie cope in the event the court should allow the move. As Dr. Perlmutter explained, "This would not necessarily be for continued therapy but would be to have a professional in place when the child likely begins to experience emotional difficulties due to the separation(s) and travel schedule."

Hales places heavy emphasis on a statement in Dr. Perlmutter's report, in which the psychotherapist said: "It is clear to the undersigned that the best possible scenario for Natalie would be for her parents to remain in the bay area, sort out their lives and allow her to have the benefit of the love and attention of both parents and extended families." What Hales overlooks is that to the extent Dr. Perlmutter considered this a realistic option he was supposed to evaluate for the court, Dr. Perlmutter was mistaken. The *Burgess* court made it clear that the trial court is not permitted to proceed under the assumption the custodial parent, who has presented a "sound 'good faith' reason[]" for seeking a move-away order, is really just "bluffing," and will not go ahead with the move if it will result in a loss of custody. (13 Cal.4th at p. 36, fns. 5, 7.) "[W]hen the trial court is faced with a request to modify the existing custody arrangement on account of a parent's plan to move away (unless the trial court finds the decision to relocate is in bad faith), the trial court must treat the plan as a serious one and must decide the custody issues based upon that premise. The question for the trial court is not whether the parent may be *permitted* to move; the question is what arrangement for custody should be made." (*Ruisi v. Thieriot, supra,* 53 Cal.App.4th at pp. 1205-1206, fn. omitted, italics in original.)

Thus, in this case, the only viable custodial options were: (1) to continue the existing arrangement of primary physical custody with Edlund with only a change in Natalie's primary residence and appropriate modifications of the visitation schedule for Hales, or (2) to transfer custody to Hales, as he had requested, based on a "substantial" showing that, as a result of the move, the child will suffer detriment rendering it " ' ". . . essential or expedient for the welfare of the child that there be a change." ' " (*Burgess, supra,* 13 Cal.4th at pp. 37-38; see also *Brody v. Kroll, supra,* 45 Cal.App.4th at pp. 1736-1737; *Ruisi v. Thieriot, supra,* 53 Cal.App.4th at p. 1203 [dispositive issue is whether on account of relocation of custodial parent a change of custody to the other parent is essential for the welfare of the child].)

Despite the evidence of "detriment" that was likely to result from the move, the trial court was apparently persuaded that it was in Natalie's best interest to maintain the well-established primary custodial relationship with Edlund.[9] After a thorough review of the record, we are satisfied that the trial court carefully considered all the factors bearing on Natalie's best interest, and that its decision was supported by substantial evidence of the strength and primacy of the bond between Natalie and her mother, Edlund's proven ability to provide and care for Natalie on a full-time basis, and the

[9]As we discuss in part II. B., *post,* the trial court also crafted a visitation schedule which was adequate to the task of minimizing the "adverse effects of the move on the father-child relationship." (See *In re Marriage of Condon, supra,* 62 Cal.App.4th at p. 549.)

overwhelming, undisputed proof that Hales was not adequately prepared to assume primary physical custody of his daughter. Thus, we conclude the trial court did not abuse its discretion by issuing a move-away order in the circumstances of this case.

B. *The Trial Court Did Not Abuse Its Discretion to Establish a Schedule for Visitation After the Move to Indiana.*

■ Hales further contends that the trial court abused its discretion in devising a schedule for visitation after the move to Indiana. He claims the court was required to increase the total amount of visitation if it issues a move-away order. Hales is mistaken.

Trial courts have "broad discretion" when establishing a schedule for visitation between the child and his or her noncustodial parent in both routine and move-away cases. (*Burgess, supra,* 13 Cal.4th at p. 40.) There was no abuse of discretion here.

The original schedule, which was devised by the parties and incorporated into their marital settlement agreement, allowed Hales approximately 60 days of visitation per year, from Friday night to Monday morning every other weekend, plus additional time at holidays and an option for 3 additional time slots with advance notice.[10] The new schedule provides thirty-five days of visitation in California—at the rate of a five-day visit (exclusive of travel time) every other month, plus an additional five-day visit during the Christmas holidays—plus *unlimited* time in Indiana with advance notice. This new schedule is subject to review and modification as Natalie grows older and can more easily spend time away from her primary caretaker, Edlund. In the totality of the circumstances presented—including Natalie's tender age, the distance between the Bay Area and her new home, and the logistical difficulties inherent in air travel for such a young child—we cannot say the trial court abused its discretion by increasing the length but decreasing the frequency of her visits with Hale.

Contrary to Hales's argument, there is no requirement that the total amount of visitation with the noncustodial parent must be increased after issuance of a move-away order. While it is true our Supreme Court approved the move-away plan in *Burgess* in part because the trial court had provided "liberal visitation" after the move, the court never stated or suggested it was

---

[10]It is undisputed, however, that Hales did not take advantage of an opportunity to spend a full week with Natalie during summer vacation, and only "once or twice" took advantage of the options to visit with his daughter on a weekday evening (from 5:00 to 7:30 p.m.), and on any entire weekday during Edlund's working hours which the child would otherwise spend in day care.

establishing a rigid standard for postmove visitation orders. The *Burgess* court further noted that "increasing the amount of visitation" or ordering "longer, but less frequent, visitation periods" after a move may serve to minimize the loss to the child of contact and established patterns of visitation with the noncustodial parent, and "obviate the need for costly and time-consuming litigation to change custody, which may itself be detrimental to the welfare of minor children because of the uncertainty, stress, and even ill will that such litigation tends to generate." (*Burgess, supra,* 13 Cal.4th at p. 40.) However, nothing in *Burgess* or in any other case of which we are aware, suggests or states that any particular modification to existing custody and visitation orders is mandatory. The precise contours of the visitation schedule is still a matter for the trial court to determine in a sound exercise of its "broad discretion." (*Ibid.*; see also *id.* at p. 36 [the trial court "is not restricted to any particular formula for contact or visitation"].)

In this case, Hales has the benefit of longer visits than he had with Natalie in the Bay Area, and can have *more* time in absolute terms than he ever spent with her in California if he himself is willing to travel to Indiana for vacations, weekends, etc., to visit his daughter in her new home. But surely the trial court did not abuse its discretion by otherwise limiting three-year-old Natalie's cross-country travel to an every-other-month routine.[11] (See *In re Marriage of Condon, supra,* 62 Cal.App.4th at pp. 552-553 [upholding schedule of four long visits per year between father and sons after mother was allowed to move with children to Australia, with additional time (up to fifteen days per month) in Australia; visitation schedule at time of trial was for two to four days per week in California]; *id.,* fn. 13 [sons who were no longer infants or toddlers could still "maintain a valuable relationship with their father with visitation which comes in longer doses four times per year"].)

C. *An Award of Appellate Attorney Fees Is Not Warranted in This Case.*

Finally, Edlund contends she is entitled to recover her attorney fees on appeal pursuant to section 271, and rule 26 of the California Rules of Court. An award of fees is warranted, she claims, because Hales has misstated the applicable law, provided a misleading, one-sided statement of the facts and procedural history of this case, and pursued a "similarly misleading writ petition."

---

[11]In his briefs, Hales suggests he is entitled to 110 days of visitation under a schedule to which he says Edlund agreed, but then withdrew her agreement, during mediation. He offers no authority to support this claim. As we have noted, the trial court was not bound to any particular visitation schedule. On this record, the trial court could reasonably conclude—based on evidence from Morante and Dr. Perlmutter, among others—that such extensive periods of separation from her primary caretaker would not be in Natalie's best interest.

■ An award of fees under section 271, subdivision (a) "is in the nature of a sanction," and is authorized where an opposing party's conduct has frustrated "the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." While we have the authority to make such an award on appeal (*In re Marriage of Mason* (1996) 46 Cal.App.4th 1025, 1028 [54 Cal.Rptr.2d 263]), we decline to do so. To be sure, Hales has taken an aggressive position in this appeal and in the related writ proceeding. But the stakes here are very high, and his position is not entirely without support in the law. Indeed, we have certified the opinion in this case for publication in an attempt to clarify and elaborate upon some aspects of move-away law that remain unresolved after our Supreme Court's decision in *Burgess*, and because it involves a "legal issue of continuing public interest." (Cal. Rules of Court, rule 976.)

Edlund's request for fees under rule 26(a) of the California Rules of Court, is a bit closer to the mark, but we reject it as well. While there is merit to Edlund's claim that Hales has selectively quoted and cited record evidence favorable to him, neither party has been completely forthright in reciting the facts and procedural history of the case. Both parties have, in effect, challenged this court to "find the evidence supporting the [trial court's] order." (*Oliver* v. *Board of Trustees* (1986) 181 Cal.App.3d 824, 832 [227 Cal.Rptr. 1].) Having been put to that task, we see no reason to reward one party over the other with a fee-shifting order.

### III. CONCLUSION

For all the foregoing reasons, the judgment of the trial court is affirmed. Edlund shall recover her costs on appeal, but her request for an award of attorney fees is denied.

Parrilli, J., and Walker, J., concurred.