[No. C039957. Third Dist. June 24, 2002.]

In re the Marriage of DAVID and ESTHER V. LASICH.
DAVID LASICH, Appellant, v.
ESTHER V. LASICH, Respondent.

## COUNSEL

Law Offices of Jerilyn Borack, Jerilyn L. Borack; Fancher & Wickland and Paige Leslie Wickland for Appellant.

Charlotte L. Keeley for Respondent.

## OPINION

**SIMS, Acting P. J.**—In this international move-away child custody case, the trial court granted the petition of Esther V. Lasich (mother) to move with

the parties' minor children from Sacramento County to Barcelona, Spain. David Lasich (father) appeals from the court's order.[1] We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother, a native of Barcelona, and father, a native of Sacramento, married in August 1994. They had two children: Sandra, born in 1995, and Monica, born in 1998.

The parties separated in September 1999. They executed a marital settlement agreement which was entered as a judgment in April 2000.[2]

As relevant, the judgment provides: (1) The parties "will have joint legal custody and joint physical custody" of the minor children. (2) Mother "will be the primary caretaker of the children, and her home will be the primary home of the children for the purposes of determining eligibility for public assistance." (3) Mother "will be the 'custodial parent' of the children" for tax purposes. (4) Father will have parenting time with the children on Tuesdays and Thursdays from 5:30 p.m. to 8:00 p.m. and on alternate weekends. (5) Mother will have four weeks of parenting time in the summer; father will have two weeks in the summer of 2000 and three weeks in subsequent summers.

On December 21, 2000, mother filed a motion for modification of the judgment as to custody and visitation so that she could move from Sacramento County to Barcelona with the minors. In supporting points and authorities, mother discussed *In re Marriage of Burgess* (1996) 13 Cal.4th 25 [51 Cal.Rptr.2d 444, 913 P.2d 473] (*Burgess*), the leading California move-away case. *Burgess* holds that a custodial parent is presumed entitled to move away with his or her minor child, absent a showing of prejudice to the child's rights or welfare. However, if parents "*share* joint physical custody of the minor children *under an existing order and in fact*," a parent's move-away request requires de novo custody review. (*Burgess, supra,* 13 Cal.4th at p. 40, fn. 12; second italics added.) Mother argued that because she was the minors' primary caregiver, the parents did not have a true joint custody parenting plan as defined in *Burgess*. Therefore, father was not entitled to a de novo custody hearing, but rather had the burden of showing that any custody change (which would keep the children in Sacramento County) would be in the minors' best interest.

[1] The order is appealable as an order made after a judgment. (Code Civ. Proc., § 904.1, subd. (a)(2).)

[2] Mother's counsel drafted the agreement. Father was not represented by counsel, but stated in the agreement that he was knowingly and voluntarily executing it after forgoing his right to seek counsel.

Father's responsive declaration requested that the court grant him physical custody of the minors if mother moved to Spain, or restrain mother from moving. In his supporting points and authorities, father argued the court must review custody de novo because the parties had a true joint custody plan within the meaning of *Burgess*. He also demanded a parental fitness evaluation under Evidence Code section 730 before the court made any decision.

Family Court Services mediator Patrick Peralta recommended in a written report to the trial court that it would be in the minors' best interest for mother to stay in the Sacramento area and continue as the primary caregiver, because the minors would suffer from the loss of frequent and continuing contact with father. However, if the court approved mother's move, father should have substantial parenting time (eight weeks in the summer and alternating two-week periods during other vacations, plus additional time in Spain) at mother's expense, as mother had agreed to offer him. (Peralta noted father's demand for physical custody if mother moved, but did not recommend that option.)

Before trial began, the trial court orally ruled that mother had primary physical custody of the minors; therefore, father would have to show detriment to the minors to defeat mother's move-away request.[3] (Cf. *In re Marriage of Edlund & Hales* (1998) 66 Cal.App.4th 1454 [78 Cal.Rptr.2d 671] (*Edlund*).) However, mother would have to show that father's parenting rights could be preserved in light of the cultural, transportational, and financial problems posed by an international move-away. (Cf. *In re Marriage of Condon* (1998) 62 Cal.App.4th 533 [73 Cal.Rptr.2d 33] (*Condon*).)

At trial, both parties testified, as did Peralta; all agreed the parties had adhered to the custody and parenting plan set out in the judgment. Father also presented an expert witness, psychologist Douglas Liebert.

*Mother's testimony*

Mother had lived in Barcelona for most of her life aside from her marriage. Her family are all still there. She had returned there frequently throughout the marriage, sometimes with and sometimes without father. She had always made clear she hoped to return permanently at some point, and he had indicated he was willing to relocate with her. During their courtship he lived there for nine months, but could not find work to suit him.

Before marrying, mother had been an executive secretary at IBM in Barcelona. Once the couple's first child was born, she did not work. Since

---

[3]The court orally repeated this ruling after the conclusion of testimony.

the separation, she has worked at part-time jobs, making $6.50 an hour. She cannot find better employment here because her spoken English is too poor, despite her attempts to improve it. However, she has been offered a job as an "import manager" with a company in Barcelona, which will pay much better and still enable her to spend time with the minors.

Mother is the minors' caregiver. She has always done all the work of parenting; father did little of it either before or after the separation. The minors love him as their father, but look to her as a "full-time mother." They are happy, well-adjusted, popular children; Sandra, the older, is completely bilingual.

Mother lives with the minors in the family residence, for which she pays $1,625 a month in rent; she also has Sandra enrolled in a private school, for which she pays the tuition. She receives $700 a month in spousal support, plus rental income from inherited commercial properties she owns in Spain, but even with this income and her part-time jobs she is running out of money.

In Barcelona, mother owns a large inherited apartment free and clear, as well as her commercial properties. She also has all her family and close friends, whereas here she has little support from father's family or anyone else. Her parents, who had helped care for the minors before, live very near her flat; she can also hire others to help.

Mother will enroll the minors in an American bilingual school in Barcelona near her residence because she wants them to retain their American heritage. She will pay for them to visit father in Sacramento twice a year. She will also finance father's trips to Spain to visit the minors as often as he likes; he can stay in family residences during his visits. She will encourage the minors to call father and communicate with him by Internet as much as possible; she will buy a computer with a Web camera for that purpose. Finally, she will continue to recognize the jurisdiction of the California courts over custody and visitation.

*Father's testimony*

According to father, he played an equal role in parenting throughout the marriage. Since the separation, he has regularly helped Sandra with schoolwork in his parenting times during the week. He helped Monica through toilet training on a recent vacation. On weekends when he has the minors, he cooks dinner, watches videos with them, takes them to Marine World or the state fair or to play with their cousins, and "just spend[s] time together" with

them. He had wanted more time with them than he got under the parties' agreement, but accepted that plan because he could not pay an attorney to fight over it and feared a judge would rule for the stay-at-home parent.

Father has a large extended family in Sacramento, including parents who had cared for the minors and cousins close to their ages. The family regularly gets together for holidays and camping trips; contrary to mother's testimony, they had always included her in these activities.

Father is an aerospace engineer employed by a manufacturing company.[4] He has two weeks of paid vacation a year and will eventually have three. However, due to the nature of his work, he can seldom take two consecutive weeks off, and unpaid vacation is frowned on; therefore, he can go to Spain for only a week at a time. Given the flying time between Sacramento and Barcelona and the inevitable jet lag, this would leave him only a few days of good parenting time per visit.

Father thinks the minors' lives would be worse in Barcelona: instead of living in a quiet suburb, they would be in a huge, noisy, polluted city. He also fears mother will try to alienate the minors from him if he loses regular contact with them. When negotiating the settlement agreement she lied about her intent to relocate, and she recently said "when she got the kids to Spain, she would finally be rid of [him] and she wouldn't have to deal with [him] any more."

Father thinks it would be a "[reasonable] compromise" for the minors to remain here with him, with mother taking them along on trips back home as she did throughout the marriage. If she moves back, that is the only way the minors can have frequent and continuing contact with both parents.

*Patrick Peralta's testimony*

After interviewing the parties and Sandra (but not Monica, as she was too young), studying court records, and consulting another mediator, Patrick Peralta concluded it would be in the minors' best interest to make no change: mother should stay in Sacramento and remain the minors' primary custodial parent under the current plan. However, if mother is allowed to move, the next best option would be for her to take the minors and to give father ample parenting time in both countries during summers and vacations; mother had said she would accept that plan and pay for the minors' and father's trips. It

---

[4]Father could not find work in his field in Barcelona because the city had no aerospace industry, although he did other kinds of work there. His Spanish is not good enough for professional-level work there now.

would not be in the minors' best interest to give father custody if mother moved, because mother was the primary caregiver.

The minors had close and loving relationships with both parents. The parents argued frequently and made charges against each other, but Peralta knew of nothing to substantiate those charges. If not for mother's proposed move, Peralta would see no reason to modify the current parenting plan; mother had not tried to frustrate father's contact with the minors, and father had expressed no discontent with the existing setup.

Sandra was completely bilingual and bicultural. Putting the minors in a bilingual and bicultural school in Spain would help their adjustment; mother's plan to do so showed she was sensitive to the minors' needs to maintain their American ties.

Sandra said she hoped to move with mother to Spain and that father would also move there. She had formed a primary attachment to mother, but was also very attached to father. Sandra told Peralta that mother had said she would die if Sandra did not relocate with her, but Peralta could not recall anything more about that statement; he did not remember discussing it with mother. He found no evidence mother was using Sandra to take care of mother's emotional needs. He also found no evidence either parent had coached Sandra.

Aside from the loss of contact with father, Peralta believed the minors would do very well with mother in Spain because of their close bond with mother and her family and the plan for bilingual, bicultural schooling. The problem of loss of contact could be alleviated not only by the visitation schedule mother had agreed to, but also by technological means for the minors to keep in touch with father.

### Dr. Douglas Liebert's testimony

Dr. Douglas Liebert, an expert in child development, testified in general terms that young children bond with both parents. Thus, rupturing a bond with either can have severe consequences.

In general, children aged two or three (like Monica) have great difficulty maintaining bonds to parents they do not see regularly and frequently; such a separation would be "pathologic" and "really bad" for such a child. For a two or three year old to see her father only in summer and on vacations "could result in a functional severing of [her] relationship with [her] father" with potentially lifelong bad consequences.

For a six year old (like Sandra), the consequences of such a separation could be even worse. Children of that age will feel guilt and self-blame about the separation, along with rejection and confusion. Their sense of loss is more profound than that of younger children and leads to more behavioral problems. A custody plan which would permit a six year old to see her father only in the summer and during vacations would have "pretty horrible" consequences, "[b]ecause . . . you're basically asking her to essentially give up her relationship with one of her parents." Any such plan could work only with children at least 10 to 12 years old.

Dr. Liebert had spoken with father, but not with mother or the minors. He had no opinions about the bonding of these parents and children. He admitted: "I certainly can't testify about these specific kids, because I've not conducted that kind of assessment. I can only talk in terms of the literature in general about kids these ages." He could offer no specific evidence that the proposed move would be pathological for these minors.

*The trial court's statement of decision*

The trial court ruled in favor of mother's relocation request. In a lengthy statement of decision, the court found the following:

The parties executed a marital settlement agreement, entered as a judgment of dissolution, which on its face provides for "joint legal custody and joint physical custody of [the minors.]"[5] The court was not modifying the judgment of dissolution in that respect. However, notwithstanding the judgment's "joint physical custody" label, the evidence shows that mother is the custodial parent and the one who has primary physical custody of the minors. She has had the minors 80 percent or more of the time since the parties' separation. Under the parties' de facto weekly physical custody plan, mother provides physical care and custody more than 80 percent of the time. "Father has physical custody on alternating weekends and for two mid-week dinners, a total of 60 hours per week." The parties' de facto arrangement determines whether purported joint custody is truly so, or whether in fact one parent has sole physical custody with visitation rights to the other. (*In re Marriage of Biallas* (1998) 65 Cal.App.4th 755, 760 [76 Cal.Rptr.2d 717] (*Biallas*).)

---

[5]The statement of decision quotes the complete terms of custody and visitation from the agreement.

Because mother is the primary physical custodian, the presumption of Family Code section 7501 applies.[6] (Further statutory references are to the Family Code unless otherwise indicated.) Thus she is entitled to change the children's residence unless the court restrains her removal because it would prejudice their rights or welfare. Under *Burgess,* father has the burden of proving the relocation would cause detriment to the minors and a different custody arrangement would be in their best interests. This means it must be " ' "essential or expedient for the welfare of the child that there be a change." ' " (*Burgess, supra,* 13 Cal.4th 25, 38.) Father has not met this burden of proof.

Father offered his own testimony and that of his mother about his ties to the minors and their ties to other members of his family. (However, by implication, that evidence did not show the minors would suffer detriment from relocating.) He also offered Dr. Liebert's testimony, but that testimony, though "interesting," provided no evidence of detriment to the minors in this case.

Relocation alone cannot prove detriment because no move-away request could succeed under that standard. (*Edlund, supra,* 66 Cal.App.4th at p. 1472.) There is no evidence mother's request was made whimsically or in bad faith or with the intent to frustrate father's contact with the minors. Absent such evidence, "[t]he paramount need for continuity and stability in the children's custodial relationship with [m]other, accomplished in a manner which best serves the children's interests, is the weightier consideration in this case."

This "paramount need" can best be satisfied by permitting mother to move to Barcelona with the minors and providing extensive parenting time for father. He will get eight weeks every summer, plus one week at Christmas and one week at spring break; the parents will alternate the Christmas holiday. Father will also have, at his choosing, up to two weeks' parenting time, which may be exercised in two 1-week periods, in Spain. Mother will pay for and purchase father's round-trip air fare between Sacramento and Barcelona. Mother will also deposit all child support payments into a trust account to finance father's other expenses for parenting time in Spain. In addition, mother will furnish both father and the minors with computer equipment, "net-meeting" software, Internet service, and training for father and the minors to video-conference at least twice a week.

Because this is an international move-away, the factors of distance, culture, and jurisdiction, identified as relevant in *Condon, supra,* 62

---

[6]Family Code section 7501 provides: "A parent entitled to the custody of a child has a right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child."

Cal.App.4th 533, figure into the analysis. Given the court's specific orders, these factors do not weigh against mother's move. In this instance, relocation is not "tantamount to an order terminating [a] parent's custody and visitation rights." (*Id.* at p. 547.)

As to distance, the family are experienced international travelers. Mother can and will fully fund father's travel expenses. The parties have undertaken shared counseling to strengthen their parenting communication skills.

As to culture, there is significant evidence the minors are bilingual and bicultural. They have spent much time in Spain. Their maternal grandparents have frequently visited them in California. Mother, a native of Spain, has inculcated her heritage in the minors since birth. Father speaks Spanish and has not only visited Spain, but has lived and worked there. The minors will attend an American school in Barcelona; if Monica is placed in daycare, she should have an English-speaking caretaker. There is no evidence that a relocation to Spain will deprive the minors of "important protections and advantages." (*Condon, supra,* 62 Cal.App.4th at p. 546.)

As to jurisdiction, mother shall register this court's custody order under the Convention on the Civil Aspects of International Child Abduction (the Hague Convention), to which Spain and the United States are parties, at least annually, and shall provide proof to father that she has registered the order before the minors may move to Spain. This order shall specify that due to the minors' residence 10 weeks or more a year in California, the minors are habitual residents of California. Mother shall file at least annually in the courts of Barcelona a declaration acknowledging the minors' habitual-resident status and shall furnish proof of such filing to father. Mother concedes that California retains exclusive jurisdiction over custody and consents to the California courts' exercise of jurisdiction to make any order pertaining to custody. Mother shall post an annually renewed $100,000 bond, forfeitable if she seeks to modify this court's order in any other country; she shall provide proof to father that she has posted bond before the minors may move to Spain. Mother consents to an order that should she violate any of these conditions her action shall be deemed a substantial change of circumstances and not in the minors' best interests. Mother consents to an order that she shall retain an attorney in Barcelona at her sole cost and shall cause to be filed a translated copy of the California order, which shall be entered and made an order of the Spanish court, specifying that only the California court has jurisdiction to modify the order, that Spain has jurisdiction only to enforce the California order as outlined therein, and that the minors are habitual residents of California; mother will file this order and provide proof she has done so before the minors may move to Spain. Mother acknowledges

that 18 United States Code section 1204, pertaining to parental kidnapping, applies to her, that if she violates this court's order she may be arrested pursuant to that provision, and that she will waive extradition on the arrest warrant.

Mother's conduct to date shows that she may be expected to adhere to the court's orders. She has consistently adhered to orders regarding parenting time. She returned to California from Spain with the minors and filed her motion seeking the court's permission to relocate the minors' residence. After the parties' divorce, she completed the process of becoming an American citizen.

Mediator Peralta testified that the best option from the minors' perspective would be for both parents to remain in Sacramento with the present custody plan. However, if he had to choose between the minors remaining in mother's physical custody in Barcelona and being placed in father's physical custody, their best interests dictate that they remain with mother and relocate.

Father's oral request for appointment of an expert under Evidence Code section 730 to conduct a custody evaluation was untimely and no evidence warranted such an evaluation.

*The court's order*

The trial court thereafter entered an order which permits mother to relocate the minors' residence to Barcelona, conditioned on observance of all the custodial and jurisdictional provisions spelled out in the statement of decision and repeated in the order. The order further specifies: Mother shall not move the minors' residence to any country other than Spain or the United States; mother shall enroll the minors in the Benjamin Franklin American School in Barcelona at her sole expense; Monica shall be placed with an English-speaking caretaker if she is enrolled in daycare; the maternal grandmother shall not be designated as the minors' primary child care provider; mother shall provide father a home and a car for his use when he visits Spain; mother shall furnish father and the minors with a specified set of items of computer equipment; and mother shall designate an agent for service of process in California before the minors depart for Spain.

## DISCUSSION

Father contends: (1) The trial court erred by treating the award of joint physical custody in the parties' judgment as if it conferred sole physical

custody on mother. (2) The trial court erred in its application of the "detriment" standard. We disagree with both contentions.

I

*The Trial Court Did Not Err in Basing Its Order on the Current Actual Custody Arrangement of the Parties.*

A. *This Court Reviews the Order of the Trial Court for Abuse of Discretion.*

Father contends the trial court's order is subject to de novo review by this court. This is incorrect. ■ It is well settled that the standard of review for custody and visitation orders, including move-away orders, is whether the trial court abused its discretion. (*Burgess, supra,* 13 Cal.4th at p. 32; *Edlund, supra,* 66 Cal.App.4th at p. 1466; *Biallas, supra,* 65 Cal.App.4th at p. 760.) No different standard applies to international move-away orders. (*Condon, supra,* 62 Cal.App.4th at p. 549.) We shall apply the abuse of discretion standard of review in this case.

B. *The Trial Court Correctly Looked to the Current Actual Custody Status of the Parties.*

■ Father contends the trial court erred by refusing to conduct a de novo review of the parties' custody situation and by placing the burden on father to show the extant custody arrangement was detrimental to the children. Father argues the trial court failed to pay proper deference to the prior judgment awarding joint physical custody to father.

The trial court did not err. *Burgess* says that a custody arrangement gets the de novo review sought by father "when parents *share* joint physical custody of the minor children under an existing order *and in fact* . . . ." (*Burgess, supra,* 13 Cal.4th at p. 40, fn. 12, second italics added.)

"[T]he term 'primary physical custody' has no legal meaning." (*Biallas, supra,* 65 Cal.App.4th at p. 759.) Therefore, to decide whether a parent seeking to move has sole or joint physical custody, "the trial court looks at the existing de facto arrangement between the parties to decide whether physical custody is truly joint or whether one parent has sole physical

custody with visitation rights accorded the other parent." (*Id.* at pp. 759-760.)[7]

" 'Sole physical custody' means that a child shall reside with and be under the supervision of one parent, subject to the power of the court to order visitation." (§ 3007.) " 'Joint physical custody' means that each of the parents shall have significant periods of physical custody." (§ 3004.)

**(3)** The Family Code does not define "significant" in this context. However, case law has established guidelines on the point. (*Biallas, supra,* 65 Cal.App.4th at p. 760.) Where children "shuttle[] back and forth between two parents" (*In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 142 [61 Cal.Rptr.2d 559] (*Whealon*)) so that they spend nearly equal times with each parent, or where the parent with whom the child does not reside sees the child four or five times a week, this amounts to joint physical custody. (*Biallas, supra,* 65 Cal.App.4th at p. 760; *Brody v. Kroll* (1996) 45 Cal.App.4th 1732, 1735-1736 [53 Cal.Rptr.2d 280]; *In re Marriage of Battenburg* (1994) 28 Cal.App.4th 1338, 1342 [33 Cal.Rptr.2d 871]; *In re Marriage of McGinnis* (1992) 7 Cal.App.4th 473, 475 [9 Cal.Rptr.2d 182], disapproved on another point in *Burgess, supra,* 13 Cal.4th at p. 38, fn. 10.) But where, as in this case, a father has a child only 20 percent of the time, on alternate weekends and one or two nights a week, this amounts to sole physical custody for the mother with "liberal visitation rights" for the father. (*Biallas, supra,* 65 Cal.App.4th at p. 760; *Whealon, supra,* 53 Cal.App.4th at p. 142; *In re Marriage of Selzer* (1994) 29 Cal.App.4th 637, 639 [34 Cal.Rptr.2d 824], disapproved on another point in *Burgess, supra,* 13 Cal.4th at p. 38, fn. 10.)

Father tries to distinguish the cases factually similar to this case where courts have not found joint physical custody, asserting that in those cases there was either no existing custody order or an order which specified an arrangement other than joint physical custody. (*Edlund, supra,* 66 Cal.App.4th at pp. 1457 & 1466, fn. 5; *Biallas, supra,* 65 Cal.App.4th at

---

[7]At oral argument, father contended this analysis was improper in light of a comment of our Supreme Court made in a footnote in *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 257, footnote 3 [109 Cal.Rptr.2d 575, 27 P.3d 289]. There, our Supreme Court said, "[*Burchard v. Garay* (1986) 42 Cal.3d 531] [229 Cal.Rptr. 800, 724 P.2d 486, 62 A.L.R.4th 237], however, rejected the argument that the changed circumstance rule applies in the case of an informal or de facto arrangement for custody, i.e., without a judicial order." According to father, this passage indicates that footnote 12 in *Burgess* cannot be read to apply where there is a formal judgment or order. We disagree. Footnote 12 in *Burgess* does not use the term "de facto custody." Rather, as we have noted, footnote 12 commands de novo review "when the parents *share* joint physical custody of the minor children under an existing order *and* in fact." (*Burgess, supra,* 13 Cal.4th at p. 40, fn. 12, second italics added.) We will not disregard the conjunctive use of "and" in this footnote 12.

p. 758; *Whealon, supra,* 53 Cal.App.4th at p. 137; *Brody v. Kroll, supra,* 45 Cal.App.4th at pp. 1735-1736.) But the results in those cases did not turn on prior custody orders' existence or wording. As *Biallas* makes clear, when a trial court must decide whether a case requires de novo custody review under footnote 12 of *Burgess, supra,* 13 Cal.4th at page 40, it does so by looking at the parties' existing de facto arrangement. (*Biallas, supra,* 65 Cal.App.4th at pp. 759-760.)

Under the *Burgess-Biallas* standard, the parties' arrangement here, however denominated in the judgment, amounted in fact—according to the terms also spelled out in the judgment and scrupulously followed by the parties—to sole physical custody for mother with liberal visitation for father. Father was therefore not entitled to de novo custody review. We perceive no abuse of discretion in the trial court's order.

### C. *The Court's Action Did Not Constitute an Impermissible Collateral Attack on a Final Judgment.*

Father argues that the methodology used by the trial court constituted an impermissible collateral attack on the judgment that had awarded joint physical custody to father. Father argues that when the trial court examined the de facto custody status of the parties, in disregard of the prior judgment, it violated important policies supporting the finality of judgments. We disagree.

Even assuming for the sake of argument the trial court's methodology represented a collateral attack on a final judgment, that attack was mandated by our Supreme Court in *Burgess,* which directed that a trial court should examine the de facto custody arrangement of the parties. (*Burgess, supra,* 13 Cal.4th at p. 40, fn. 12.) That rule was binding on the trial court and is binding on this court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)

Moreover, we think the Supreme Court's directive makes sense. A trial court is more likely to arrive at a fair and just adjudication of the parties' custody situation if it examines the realities of the present situation rather than the possible fictions of a prior order or judgment.

We perceive no abuse of discretion in the trial court's order.

## II

*The Trial Court Properly Placed the Burden on Father to Show Detriment to the Children If Mother Moved to Spain.*

Father contends that even if mother was the custodial parent for purposes of the move-away request (as the trial court found), the trial court

erred by holding father to "an impossibly heavy burden of establishing detriment unconnected to the move." Father also alleges the court erred in other respects in making its disposition. We conclude father has shown no abuse of discretion.

Having determined mother was the primary custodial parent, the trial court applied the *Burgess* standard: the court treated father's opposition to mother's move-away request as a demand for change of custody and put the burden on him, as the party seeking change, to prove relocation would cause detriment to the minors. (*Burgess, supra,* 13 Cal.4th at pp. 37-38.) It was appropriate for the court to do so because father expressly demanded sole physical custody of the minors if mother was allowed to move.[8]

The trial court also found that father could not prove detriment to the minors merely from the fact of relocation. This finding was also correct.

"[W]e cannot imagine a case in which a child with any meaningful relationship with the noncustodial parent would not be 'significantly negatively impacted' by a good faith decision by a custodial parent to move, over the noncustodial parent's objection, to a distant location. But if the evidence of 'detriment' contained in [the mediator's] report [i.e., separation from the noncustodial parent and regular lengthy cross-country travel] were sufficient to support denial of a move-away order in this case, no primary custodial parent would *ever* be able to secure such an order. A reversal [of the trial court's permission to move away] would run contrary to *Burgess*, where our Supreme Court noted that '. . . the interests of a minor child in the continuity and permanency of custodial placement with the primary caretaker will most often prevail' [citation], and that the showing required to overcome this presumption is 'substantial' [citation]. It would also fly in the face of the emerging trend of decisions by which California courts have approved long-distance relocations, and those decisions have been upheld on appeal on records similar to the instant one. [The court cited *Condon, supra,* 62 Cal.App.4th 533; *Biallas, supra,* 65 Cal.App.4th 755; and *Whealon, supra,* 53 Cal.App.4th 132.]" (*Edlund, supra,* 66 Cal.App.4th at p. 1472.)

Father asserts that the "detriment standard" under *Edlund*, which the trial court relied on, should not be used to allow all move-aways while ignoring the impact of the move, "especially where as here the separations caused by the move will sever the child-parent relationship . . . ." But the trial court

---

[8]The court did not expressly address father's alternative proposal: to restrain mother from relocating. We discuss that point below.

expressly rejected father's claim that the move will inevitably cut his ties to the minors. Furthermore, as we have shown, the court crafted exhaustively precise and detailed orders to prevent that outcome.

█ Father points out correctly that the trial court in a move-away case must consider the minors' need for frequent and continuing contact with both parents. (§ 3020; *Burgess, supra*, 13 Cal.4th at pp. 34-35.) But this observation does not show the trial court erred, because it did consider that factor.

Section 3020 "does not purport to define the phrase 'frequent and continu[ing]' or to specify a preference for any particular form of 'contact.' Nor does it include any specific means of effecting the policy, apart from 'encourag[ing] parents to share the rights and responsibilities of child rearing.' " (*Burgess, supra*, 13 Cal.4th at p. 35.) █ The trial court's orders on custody, visitation, and Internet communication are tailored to foster the minors' frequent and continuing contact with father. It is true that in-the-flesh visits will occur farther apart in time, but nothing in section 3020 precludes that change. It is also undisputed that father's overall percentage of parenting time will remain roughly the same.

Father asserts the trial court improperly disregarded the testimony of his expert witness, Dr. Liebert, and the court-appointed mediator, Patrick Peralta, that relocation would harm the minors psychologically. We disagree. The court merely and appropriately determined that these opinions were not dispositive. Dr. Liebert did not opine that *this* relocation would harm *these* minors: as he admitted, he could give the court no guidance on that point because he had not even met anyone involved in the case aside from father. And Peralta's recommendation that mother stay in Sacramento with the minors disregarded the applicable legal standard: both in his report and his testimony, he effectively put the burden on mother, the custodial parent, to justify the relocation. In any event, the trial court adopted Peralta's second option (that mother relocate with the minors, provided she makes increased efforts to ensure father's access to them), which comported with the applicable legal standard.

Father asserts the trial court did not adequately follow the guidelines of *Condon, supra*, 62 Cal.App.4th 533, the leading case on international move-aways. Again, we disagree.

The trial court ruled at the start of trial that under *Condon*, mother had to prove father could exercise his parental rights after a relocation, given the

financial, transportational, and cultural problems of international move-aways. The court found at the end of trial—again citing to *Condon*—that mother had met that burden by agreeing to a host of conditions as to transportation, finance, and housing, and that there was no evidence the relocation would harm the minors culturally. The court further heeded *Condon* by imposing rigorous jurisdictional terms to ensure its orders will be enforceable in Spain.[9]

Father does not attack any of the trial court's specific findings and orders under *Condon*. Rather, he points to *Condon*'s observation: "[E]xcept for those of considerable means, any relocation to another continent is likely to represent a de facto termination of the non-moving parent's rights to visitation and the child's rights to maintain a relationship with that parent. [Citation.] Thus, *when a relocation would have this practical effect*, before allowing the move-away a trial court should require the moving parent to satisfy the burden of showing the termination of those rights would be in the best interests of the child." (*Condon, supra,* 62 Cal.App.4th at p. 547, italics added.) He asserts that the relocation here, unlike that in *Condon*, will have this effect because he is less wealthy and able to travel than the nonmoving parent in *Condon* and the time differences between Sacramento and Barcelona make regular telephone communication impracticable. (He fails to mention the Internet communication ordered by the trial court, along with the list of equipment mother is required to furnish both him and the minors for that purpose.) He then concludes the trial court erred by not requiring mother to prove it would be in the minors' best interests to terminate his relationship with them. We are not persuaded.

The trial court expressly found in its statement of decision—quoting the very passage in *Condon* father relies on—that this move-away, given all the conditions the court is imposing on mother to protect father's parental rights, will not amount to a termination of those rights. The court reasonably exercised its discretion to make that finding. On this record, mother is a person "of considerable means" (*Condon, supra,* 62 Cal.App.4th at p. 547), and the trial court has ordered her to use those means to help father exercise his parental rights. Furthermore, as the court also found, mother has never tried to block him from exercising those rights and there is no good evidence she intends to do so after the relocation. Because the relocation will not terminate father's parental rights, mother had no burden to prove that that eventuality would be in the minors' best interests.

---

[9]In *Condon*, the appellate court found that although the trial court had sufficiently addressed most problems associated with the mother's relocation to Australia, the court failed to ensure its orders would be enforceable there. (*Condon, supra,* 62 Cal.App.4th at pp. 554-562.) The trial court's jurisdictional orders in this case closely track those recommended in *Condon*. (*Ibid.*)

Finally, father asserts the trial court failed to consider his alternative proposal: to restrain mother from moving. Although the court did not expressly consider this option in its statement of decision, father can show no prejudice from the court's silence.

■ As father notes, a custodial parent's presumptive right to relocate with minor children is "subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child." (§ 7501; see fn. 6, *ante*.) However, this standard also puts the burden on the noncustodial parent to prove relocation will cause detriment to the minors, a showing father failed to make. (See *Burgess, supra*, 13 Cal.4th at pp. 35, 37-38.)

■ Moreover, *Cassady v. Signorelli* (1996) 49 Cal.App.4th 55 [56 Cal.Rptr.2d 545] (*Cassady*), the only decision father cites in which the court restrained a custodial parent from moving, involved facts grossly unlike those here. In *Cassady*, the mother, who had never been married to the father, sought to move from the Bay Area, where she had employment as a jeweler, to Florida, where she had only vague hopes of setting up as a "parapsychologist" (a field in which, as the court dryly noted, there are almost no jobs available anywhere in the world). (*Id.* at pp. 58, 60.) The appellate court agreed with the trial court that it appeared the mother simply wanted to get away from the father and frustrate his parental rights. (*Id.* at pp. 59-60.) The trial court and appellate court also found the mother was "flaky" and "almost delusional," had "difficulty coping with the stresses and pressures of life," and had "questionable decision making ability," yet wanted to home-school the minor and make the final decisions about the minor's health care. (*Id.* at pp. 61-62.)

Given these facts, the mother's relocation in *Cassady* obviously stood to "prejudice the rights or welfare of the child." (§ 7501.) There are no such facts in the present case. And unlike in *Cassady*, mother's "desire to have the comfort and support of her parents and other family members in the aftermath of the dissolution of her marriage cannot be fairly described as whimsical." (*In re Marriage of Bryant* (2001) 91 Cal.App.4th 789, 794 [110 Cal.Rptr.2d 791].) Therefore *Cassady* does not support father's proposed option.

For all the above reasons, father has failed to show any abuse of discretion in the trial court's order.

## DISPOSITION

The trial court's order is affirmed. Mother shall recover her costs on appeal. (Cal. Rules of Court, rule 26(a).)

Callahan, J., and Robie, J., concurred.