Filed 2/17/22; Certified for Publication 3/18/22 (privacy redactions made per attached pub. & mod. order)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>     Plaintiff,<br><br>v.<br><br>H.H.,<br><br>     Defendant and Respondent;<br><br>A.M.,<br><br>     Intervener and Appellant. | A161503<br><br>(San Francisco County Super. Ct. No. FCS-15-351235) |

Family Code section 3044[1] creates a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence against the other party seeking custody within the past five years is detrimental to the child. If the court determines the presumption has been overcome, it must state its reasons in writing or on the record. Here, the trial court issued a restraining order protecting a mother from the father of a young child and, citing the statute, granted the mother

---

[1] Further statutory references will be to the Family Code except as otherwise specified.

1

sole legal and physical custody, but left intact a visitation schedule under which the child lived with each parent approximately half time. Mother argues this schedule amounted to joint physical custody and therefore violated the statute. She also contends the trial court erred in refusing her request for a statement of decision. We agree with mother and reverse the visitation order.

## BACKGROUND

The parties are the parents of a son, D.H., who was born in September 2015. The following description of the facts leading to mother's request for a domestic violence restraining order and sole legal and physical custody of the child are taken from mother's declaration and the court orders included in the record. Father did not file a respondent's brief on appeal.

According to mother's declaration, when she told father she was pregnant, he got "so angry, he kicked [her] in the stomach." She did not call the police because she was scared of what he would do.[2] In March or April of 2015, mother saw father downtown with another woman. He got upset and slapped her, and she heard him tell the woman "it wasn't his baby." Father grabbed mother by her hair and yanked so hard he tore out two big braids and left a bald spot on her scalp. Mother called the police but father left before they arrived. Thereafter, mother tried to avoid father. The woman started to taunt mother, saying she wanted to fight mother and telling her, " 'Bitch, you are having this baby for me.' "

The birth was difficult and both D.H. and mother ended up in critical care. D.H. remained in the hospital for a month, during which time father

_____

[2] Mother stated that father told her he had two strikes for felony offenses, one for hitting a woman and one for selling drugs and guns, and when he hurt or threatened her, he also "intimidate[d] her into not calling the police, because he said he does not want to get the third strike."

2

visited once.  Around the end of 2015, a paternity test father had requested confirmed he was the father and mother filed for child support.  Father was furious and called mother many times, calling her a bitch.

In early 2016, when mother went to her car to drive to a child support hearing, she found her tires punctured and flat.  Later that day, people in her building told her they had seen father flattening the tires.

At the hearing, father was angry and aggressive with mother.  He came up behind her when she went to the bathroom and yelled, " 'Bitch, I am going to beat the fuck out of you!' "  Mother was so scared she went into the wrong courtroom.  Father was arrested.

In 2016, father sought custody orders.  After hearings and mediation, in August 2016, the court granted mother temporary sole physical and legal custody.  In October 2016, mother filed a request for a restraining order against father, which was denied.  Father then sought a restraining order against mother, the hearing on which was continued to January 11, 2017. Meanwhile, at a hearing in December 2016, the court granted father visitation from 10:00 a.m. to 3:00 p.m. on Thursdays and Saturdays, with exchanges on Thursdays at the San Francisco Police Department's central station and exchanges on Saturdays at Rally Visitation Services (Rally). A review hearing was set for January 11, 2017, together with the hearing on father's restraining order request.

Father did not appear at the hearing on January 11, 2017, and the restraining order request was taken off calendar.  Although she was present, mother did not know the custody portion of the hearing was continued to February 23, 2017, and, as a result, did not go to the February hearing.  At that hearing, the court ordered joint legal and physical custody of D.H. and increased father's parenting time, ordering weekly visits running from

3

Tuesday morning to Friday morning or afternoon (depending on the availability of supervision at Rally, where the exchanges were to occur). Mother filed a request to return to sole legal and physical custody but was not able to serve father.

Problems escalated when the parties started the new schedule. Father would yell at mother in front of D.H. during exchanges, insult her and tell her he was going to hurt her, and he frequently returned D.H. late after his visits.[3] Mother was scared to ask the court to change the custody order because father was "so angry and intimidating," including threating to "try to kill [mother] if [she] took him to court."

In 2018, on multiple occasions, father called the police or Child Protective Services (CPS), accusing mother of threatening him or hurting the baby, both of which mother denied. Mother was interviewed by CPS repeatedly, as were her older children from a prior relationship, and each time the case was closed.

On one occasion in December 2018, father returned D.H. with "so many scratches and bruises that [mother] took him to the doctor, and the doctor reported it to CPS." Mother spoke with CPS and the case was closed.

In January 2019, mother received a call from a doctor saying father had taken D.H. to urgent care and accused mother of burning the child with a cigarette. Father then refused to return D.H. for "many weeks" and filed an ex parte request for sole custody. According to her declaration, mother does

---

[3] Rally reported late returns after four of five visits in February 2017, and, to mother's understanding, subsequently kicked father out of the program. Father then started coming to mother's house "whenever he wanted to exchange our son," sometimes returning D.H. at 10:00 or 11:00 p.m., even after the parties agreed to have the exchanges at the police station.

not smoke, and she denied hurting D.H. in any way. The court denied the emergency orders at a hearing on February 1, 2019, but father still refused to return D.H. Mother worked with the San Francisco County District Attorney's Child Abduction Unit but did not get D.H. back until March 18, 2019.

After a hearing on April 2, 2019, the court found it was in D.H.'s best interests to continue the existing custody and visitation orders. The court noted that CPS found the allegations of neglect by mother unfounded and closed the case, and found there was "no credible evidence" supporting mother's request for sole custody and termination of father's visitation. The court ordered both parties to participate in the Kids Turn co-parenting program within six months and file proof of completion with the court no later than October 31, 2019.

On September 30, 2019, mother received about 30 phone calls from a private number in which a woman asked if she was D.H.'s mother and mother could hear a man's voice in the background. The next day, the same woman called and said, " 'Bitch, you sucking his dick? I've been beating your son.' " Mother could hear father in the background saying things including that "they were going to blow up my car and my house with my kids in it," he was going to "beat my ass and tear my car up," and he had a gun. Father and the woman were laughing, and both sounded drunk. Mother called 911 and the police helped her get an emergency protective order against father's girlfriend.

Father continued to insult or threaten mother during exchanges when other people were not present, and told her on three occasions that he had a gun. In May 2020, he told her he would "beat [her] ass" if she called the police again, and on two or three other occasions that he was going to hurt or

5

kill her. Mother was "scared for [her] life, and always watching over [her] back." She was also scared father or his girlfriend were hurting D.H. D.H. told her "over 100 times" that father, the girlfriend, or his older brother (father also has older children) hit him, and on July 6, 2020,when D.H. returned to mother, he had "big red bags under his eyes" and said father had punched him in the chest. On a number of occasions, D.H. returned from visits displaying violent behavior (strangling mother, pushing her, and yelling " 'fuck you!' ") and, on one occasion saying, " '[y]ou weren't supposed to have me, I wasn't supposed to be here.' " Around July 16, 2020, mother found the driver's side door of her car "smashed in," a scratch and a dent on the passenger side, a light "coming off" the car, and a tire punctured.

Problems with father not returning D.H. to mother at the court-ordered time also continued, with father sometimes making excuses and sometimes failing to respond to mother's texts asking about the child. On one occasion in 2020, father kept D.H. for several days beyond the end of his scheduled visit, even after calls from the police.

Mother's declaration concluded, "I fear for my life and for our son's safety. [H.H.] is torturing me. I don't trust him. I am scared that he is going to kill me. Living with this kind of fear is hard on me and my children, including our son. I really need someone to help me."

Mother's request for a domestic violence restraining order was filed on July 24, 2020, seeking protection from father for mother, her two older children, and D.H. Mother also requested sole legal and physical custody of D.H. The court issued a temporary restraining order and set a hearing for August 12, 2020. Temporary orders pending the hearing gave mother legal and physical custody of D.H. with no visitation for father.

In the declaration accompanying father's response to the requests for orders, father denied all of mother's factual assertions and stated that mother continuously makes up lies about him. He stated that mother knew about the February 2017 hearing at which his visitation was increased and chose not to attend "because she had been caught in a series of lies after filing a false police report about me." He further stated that a CPS investigation was opened in January 2019, when he took D.H. to the doctor because the child appeared to have been burned by a cigarette, and that he called CPS in April 2020 because D.H. had "a large knot" on his head and scratches on his body when father picked him up from mother's home. Father believed mother was addicted to prescription pills and "a lot of the issues [she] and I have in communicating about our son are derived from her narcotics abuse," and asked that she be required to undergo drug testing.[4] He stated that he had completed the parenting program previously ordered by the court, and his girlfriend had also completed the program. Father requested modification of the custody order to give him physical custody during school days and every other weekend, with alternate weekend visits for mother.

On August 12, 2020, the court granted mother's request to review father's response and continued the hearing to August 26, extending the temporary restraining order to that date, but reinstating father's custodial time with D.H. from 4:30 p.m. on Tuesdays until 6:30 p.m. on Fridays, with exchanges inside the San Francisco Police Department's central station. The

---

[4] Father stated that mother was selling prescription pills when they were together, and that in 2014, he was stabbed by mother's sister or her boyfriend as a result of a dispute they were having with mother over the sale of narcotics. He denied using drugs and stated he was regularly drug tested for his job as a MUNI bus driver. He also denied owning or possessing any firearms and stated he had not been in trouble with the law for more than a decade.

parties were ordered to communicate only by text message and only regarding the child, and reminded of the order to provide the court with proof of completion of the Kids' Turn program.

At the August 26 hearing, mother testified that in May 2020, father threatened to "kill me with a gun" while standing about a foot away from her at the gate to her apartment complex, and "he looked like he was going to do it to me." On the phone in May 2020, he said he was going to "beat me and kick my ass if he knew he wasn't going to go to jail." Mother also testified that father pulled out her braids from the roots in 2016, punched her in the stomach, and slapped her. She described the incident related in her declaration in which father followed and threatened her in court, and was arrested, and testified that her tires were punctured on two occasions before court hearings in this case. Mother testified, "I fear for my life. . . . I mean, you know, he has two strikes. I fear for my life. I'm scared, and I feel like I need a restraining order from him."

Father's attorney declined to have him testify, saying she would rely on his sworn declaration "basically denying all of [mother's] unfounded and uncorroborated statements." Counsel pointed out there were no police reports, phone records, or other evidence to support any of mother's assertions. Counsel noted that father and his girlfriend were providing certificates to prove completion of a parenting program equivalent to the specific one the court had earlier ordered the parties to complete, while mother had not provided any proof of having completed a parenting program.

Mother's attorney, after noting that mother was prepared to testify about her concerns that D.H. was being abused, argued, "in the event the court finds my client's testimony credible that a single past act of abuse has occurred and enters this restraining order based on that alone, then joint

8

custody of the children is not appropriate until [section] 3044 is rebutted." Father's attorney did not suggest the presumption would be rebutted or otherwise address this issue. Mother's attorney also requested a statement of decision, to which the court replied, "I'm not going to issue a statement of decision on this case."

The court found sufficient evidence to grant a three-year restraining order protecting mother and her two older children. It removed D.H. from the scope of the order, stating, "[i]f there is abuse of the minor—and I know from the history of this case that there's been cross-allegations of abuse— each parent should immediately report it to CPS and have them deal with the abuse issues."

The court gave mother temporary sole legal and physical custody "pursuant to Family Code section 3044." It found good cause to maintain the existing visitation schedule, however, and ordered that father have parenting time from 4:30 p.m. on Tuesdays until 6:30 p.m. on Fridays. Mother's attorney objected that leaving this schedule in place violated section 3044 because the "essentially 50/50" time share was a "de facto joint custody order." The court noted the objection and stated, "I think this is in the best interest of the minor. I think that this is the schedule that the child has had for a number of years now."

The court ordered both parents to refrain from speaking negatively about the other in front of the child, all exchanges to occur inside the San Francisco Police Department's central station, and all communications between the parties to be through text or email, with phone, video, or in person communication only in case of emergencies. The court further specified parameters under which father would forfeit a visit for which he

was late to pick up, and warned it would consider moving the exchange date if there was a pattern of late pick-ups.

Father's counsel asked the court to order mother to submit proof that she completed the court-ordered parenting program and the court noted that order was outstanding, and "to the extent that [mother] wants to seek any change, that is something that I took into consideration.  So if she hasn't done what the court ordered, the court is not likely to change the visitation schedule.  [¶]  So please have that done; okay?"

Mother filed a timely notice of appeal.

## DISCUSSION

As relevant here, section 3044, subdivision (a), provides:  "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child . . . , there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child . . . .  This presumption may only be rebutted by a preponderance of the evidence."

"This presumption is mandatory and the trial court has no discretion in deciding whether to apply it:  '[T]he court *must* apply the presumption in any situation in which a finding of domestic violence has been made.  A court may not " 'call . . . into play' the presumption contained in section 3044 only when the court believes it is appropriate." ' (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1498 (*Fajota*); see *Christina L. v. Chauncey B.* (2014) 229 Cal.App.4th 731, 736 (*Christina L.*) [' "Because a [Domestic Violence Prevention Act] (DVPA) restraining order must be based on a finding that the party being restrained committed one or more acts of domestic abuse, a

10

finding of domestic abuse sufficient to support a DVPA restraining order necessarily triggers the presumption in section 3044" '].)" (*Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 661–662 (*Celia S.*).)

To overcome the presumption, the court must find "[t]he perpetrator of domestic violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child." (§ 3044, subd. (b)(1).) This determination must be made without consideration of the statutory preference for "frequent and continuing contact with both parents" set forth in sections 3020 and 3040;[5] this statutory preference "may not be used to rebut the presumption, in whole or in part." (§ 3044, subd. (b)(1).)

The court must also find that certain factors enumerated in section 3044, subdivision (b)(2), "on balance, support the legislative findings in Section 3020." (§ 3044, subd. (b)(2).) Section 3020, subdivision (a), provides: "The Legislature finds and declares that it is the public policy of this state to ensure that the health, safety, and welfare of children shall be the court's primary concern in determining the best interests of children when making any orders regarding the physical or legal custody or visitation of children. The Legislature further finds and declares that children have the right to be

---

[5] Section 3020, subdivision (b), "finds and declares that it is the public policy of this state to ensure that children have frequent and continuing contact with both parents after the parents have . . . ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy, except when the contact would not be in the best interests of the child[.]"

Section 3040, subdivision (a)(1), specifies that one of the factors a court must consider in making a custody order is "which parent is more likely to allow the child frequent and continuing contact with the noncustodial parent[.]"

11

safe and free from abuse, and that the perpetration of child abuse or domestic violence in a household where a child resides is detrimental to the health, safety, and welfare of the child."

The specific factors the court must consider are as follows:

"(A) The perpetrator has successfully completed a batterer's treatment program that meets the criteria outlined in subdivision (c) of Section 1203.097 of the Penal Code.

"(B) The perpetrator has successfully completed a program of alcohol or drug abuse counseling, if the court determines that counseling is appropriate.

"(C) The perpetrator has successfully completed a parenting class, if the court determines the class to be appropriate.

"(D) The perpetrator is on probation or parole, and has or has not complied with the terms and conditions of probation or parole.

"(E) The perpetrator is restrained by a protective order or restraining order, and has or has not complied with its terms and conditions.

"(F) The perpetrator of domestic violence has committed further acts of domestic violence." (§ 3044, subd. (b)(2).)

Section 3044 expressly requires a court to explain its reasons in writing or on the record if it finds the presumption of detriment has been overcome, including specific findings on each of the factors in subdivision (b). "(f)(1) It is the intent of the Legislature that this subdivision be interpreted consistently with the decision in *Jaime G. v. H.L.* (2018) 25 Cal.App.5th 794, which requires that the court, in determining that the presumption in subdivision (a) has been overcome, make specific findings on each of the factors in subdivision (b). [¶] (2) If the court determines that the presumption in subdivision (a) has been overcome, the court shall state its reasons in writing or on the record as to why paragraph (1) of subdivision (b)

is satisfied and why the factors in paragraph (2) of subdivision (b), on balance, support the legislative findings in Section 3020."

In the present case, the trial court found section 3044 applied and therefore granted sole legal and physical custody to mother. Its order, however, maintained the schedule under which D.H. was with father from Tuesday to Friday each week. The court was not swayed by mother's argument that this was in essence a 50/50 time share that violated section 3044 despite the court's formal award of sole physical and legal custody to mother.

*Celia S.* held the trial court violated section 3044 where, after finding the father's domestic violence against the mother triggered the section 3044 presumption and awarding sole legal and physical custody of the children to the mother, the court ordered visitation for the father in the form of a previously existing 50/50 timeshare custody arrangement. (*Celia S., supra,* 3 Cal.App.5th at p. 663.) Explaining that "in determining the true nature of the court's order, we must consider the legal effect of the order, not the label the court attached to it," the *Celia S.* court agreed with the mother's contention that "the trial court may not circumvent section 3044 by characterizing its order as merely an award of visitation." (*Id.* at p. 658.)

*Celia S.* explained, "Under the Family Code, ' "[j]oint physical custody" means that each of the parents shall have significant periods of physical custody.' (§ 3004; see *In re Marriage of Biallas* (1998) 65 Cal.App.4th 755, 760 (*Biallas*) ['Joint physical custody exists where the child spends significant time with both parents']; cf. § 3007 [' "Sole physical custody" means that a child shall reside with and be under the supervision of one parent, subject to the power of the court to order visitation'].)" (*Celia S., supra,* 3 Cal.App.5th at p. 663.) While there is no statutory definition of " 'significant' time" for

13

purposes of "identifying a joint physical custody arrangement," *Celia S.* cited cases establishing guidelines: " 'Where children "shuttle[] back and forth between two parents" [citation] so that they spend nearly equal times with each parent, or where the parent with whom the child does not reside sees the child four or five times a week, this amounts to joint physical custody.' ([*In re Marriage of*] *Lasich* [(2002) 99 Cal.App.4th 702], 715, [disapproved on other grounds by *In re Marriage of Lamusga* (2004) 32 Cal.4th 1072, 1097]; *People v. Mehaisin* (2002) 101 Cal.App.4th 958, 964; *Biallas*, . . . at p. 760 [joint physical custody exists when children spend four days each week with one parent and three days with other parent].) [¶] In contrast, where 'a father has a child only 20 percent of the time, on alternate weekends and one or two nights a week, this amounts to sole physical custody for the mother with "liberal visitation rights' for the father.' " (*Lasich,* . . . at p. 715; *Biallas,* . . . at p. 760 [custody one day per week and alternate weekends constitutes liberal visitation, not joint custody]; *In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 138, 142 [same].)" (*Celia S.,* at pp. 663–664.)

The visitation schedule here, three days with father and four with mother, clearly amounted to joint physical custody. The court obviously did not make any finding that the section 3044 presumption was overcome, as it granted mother sole legal and physical custody pursuant to section 3044. To order visitation that was effectively joint physical custody, the court would have had to find the presumption overcome by a preponderance of the evidence showing the order was in the child's best interest—without consideration of the statutory preference for "frequent and continuing contact with both parents"—and to find the factors in section 3044, subdivision (b)(2), "on balance, support the legislative findings in Section 3020." (§ 3044, subd. (b).) And the court would have had to state its reasons for making

14

these findings "in writing or on the record," including "specific findings on each of the factors in subdivision (b)."

None of these requirements were met. The trial court simply stated that it believed its order was in D.H.'s best interest and "this is the schedule that the child has had for a number of years now." We have no choice but to conclude the court failed to comply with section 3044.

Mother further argues that the trial court violated section 3022.3 by denying her request for a statement of decision. This statute provides: "Upon the trial of a question of fact in a proceeding to determine the custody of a minor child, the court shall, upon the request of either party, issue a statement of the decision explaining the factual and legal basis for its decision pursuant to Section 632 of the Code of Civil Procedure."

Code of Civil Procedure section 632 requires the court to "issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial." The statement of decision must be in writing unless the parties agree otherwise or unless the trial is concluded within one calendar or less than eight hours over more than one day, in which case the statement of decision may be made orally on the record in the presence of the parties. (*Ibid.*)

In general, Code of Civil Procedure section 632, and therefore section 3022.3, "applies when there has been a trial followed by a judgment. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294.) It does not apply to an order on a motion. (*Ibid.*) This is true even if the motion involves an evidentiary hearing and the order is appealable. (*Gruendl v. Oewel Partnership, Inc.* (1997) 55 Cal.App.4th 654, 660.)" (*In re Marriage of Askmo* (2000) 85 Cal.App.4th 1032, 1040.) But "[e]xceptions to the general rule have been

15

created for special proceedings. (*Gruendl*, . . . at p. 660; accord, *Maria P., . . .* at p. 1294.) In determining whether an exception should be created, the courts balance ' "(1) the importance of the issues at stake in the proceeding, including the significance of the rights affected and the magnitude of the potential adverse effect on those rights; and (2) whether appellate review can be effectively accomplished even in the absence of express findings." [Citation.]' (*Gruendl*, . . . at p. 660.)" (*In re Marriage of Askmo,* at p. 1040.)

"[W]here the issues are sufficiently important, as in a child custody case, formal findings of fact and conclusions of law are required upon the request of a party, regardless of the nature of the proceedings." (*In re Marriage of S.* (1985) 171 Cal.App.3d 738, 747 [modification of custody order]; *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792 ["Although custody is a special proceeding, statutory and decisional law nevertheless require findings of fact when requested by a party"]; *In re Rose G.* (1976) 57 Cal.App.3d 406, 416 [findings of fact and conclusions of law required in proceedings to terminate parental rights].)

The importance of issues bearing on child custody and visitation orders are obvious. As we have said, the Legislature has declared it the "public policy of this state to ensure that the health, safety, and welfare of children shall be the court's primary concern in determining the best interests of children when making any orders regarding the physical or legal custody or visitation of children," that "children have the right to be safe and free from abuse," and that "the perpetration of child abuse or domestic violence in a household where a child resides is detrimental to the health, safety, and welfare of the child." (§ 3020, subd. (a).) The Legislature has also stated that when these policies conflict with the additional public policy of ensuring that children "have frequent and continuing contact with both parents after the

16

parents have . . . ended their relationship," "a court's order regarding physical or legal custody or visitation shall be made in a manner that ensures the health, safety, and welfare of the child and the safety of all family members." (§ 3020, subds. (b) & (c).)

*Jaime G. v. H.L., supra,* 25 Cal.App.5th at pages 805–807, discussed at some length the particular importance of specific findings in the context of section 3044. "The purpose of the rebuttable presumption statute is to move family courts, in making custody determinations, to consider properly and to give heavier weight to the existence of domestic violence. (E.g., Sen. Com. on Judiciary, Analysis of Assem. Bill No. 840 (1999-2000 Reg. Sess.) July 13, 1999.)" (*Jaime G.,* at p. 805.) "Presumptions are used in this context because courts have historically failed to take sufficiently seriously evidence of domestic abuse"; they address the problem of it being " 'too easy for courts to ignore evidence of domestic abuse or to assume that it will not happen again' " and " 'function to counteract the proven tendency of some courts to make judgments based on ignorance or stereotypes.' " (*Id.* at p. 806, quoting Bartlett, *Preference, Presumption, Predisposition, and Common Sense: From Traditional Custody Doctrines to the American Law Institute's Family Dissolution Project* (2001) 36 Fam. L.Q. 11, 23.) "Mandatory checklists," as *Jaime G.* described the factors in section 3044, subdivision (b)(2), "can improve professional decisionmaking for professionals as diverse as surgeons and pilots," and while they "can seem bothersome to experienced professionals," the "Legislature's intent was to require family courts to give due weight to the issue of domestic violence" and "the requirement that courts make specific findings 'in writing or on the record' further this legislative goal." (*Jaime G.,* at p. 806.) Written findings facilitate meaningful appellate review grounded on the "policies set forth in the

governing law," which is "essential to the creation of the body of precedent necessary for the system of rebuttable presumptions to produce consistent and predictable results." (*Ibid.*)

The need for clear and specific findings to facilitate appellate review, as well as to inform the parties and ensure consideration of the proper factors in the first instance, is illustrated by the present case. The trial court awarded mother sole legal and physical custody pursuant to the statutory presumption that awarding custody to father, who the court found to have committed domestic violence against mother, would be detrimental to D.H. The court made no determination that father proved by a preponderance of the evidence that an award of custody to him would be in the child's best interest with respect to the considerations and policies contained in sections 3011 and 3020, and that the section 3044, subdivision (b)(2), factors "on balance, support the legislative findings in section 3020." Had the court made such a determination, the presumption would have been overcome and the court would have been required to explain its reasons in writing or on the record. (§ 3044, subd. (f)(2).) Yet the trial court kept in place an arrangement under which D.H. was with father three days of the week—a nearly equal timeshare that amounted to joint custody. This order is irreconcilable with the custody order under section 3044, and the only explanation the trial court provided, other than a conclusory statement that it was in the child's best interests, was that "this is the schedule that the child has had for a number of years now."

The trial court abused its discretion in ordering a visitation schedule that amounted to joint custody after finding father committed domestic violence against mother and awarding sole legal and physical custody to mother pursuant to the section 3044. It further erred in refusing mother's

18

request for a statement of decision.[6]  The errors are prejudicial, as the record offers no explanation to reconcile the orders and demonstrate the court found the presumption rebutted.  Reversal of the visitation order is required.  (*Celia S., supra,* 3 Cal.App.5th at pp. 658, 664.)

On remand, the court may award father visitation that does not amount to joint custody.  (*Celia, supra* 3 Cal.App.5th  at p. 664.)  "In doing so, however, the court must comply with statutory provisions governing a

---

[6] Mother argues that a statement of decision is required even though section 3044 requires a statement of reasons when the court finds the presumption rebutted.  She correctly observes that the section 3044 requirement for a statement of reasons does not apply where, as in the present case, the court finds the presumption applies.

Mother also argues a statement of decision would be required where the court does provide a statement of reasons, because a statement of reasons provides less explanation and therefore an inferior basis for appellate review.  This part of her argument is based on *In re Marriage of Buser* (1987) 190 Cal.App.3d 639, 642, which distinguished the statement of reasons required when a court grants or denies a request for joint custody (§ 3082) from a statement of decision:  While the former was intended just to convey the court's reasons to the parents and not to "set forth the legal basis for the decision," the latter "is a formal legal document containing the factual and legal basis for the court's decision," which the parties can have input into according to a "highly detailed process" and which "provides the framework within which a trial court's decision can be reviewed by the appellate court." (*In re Marriage of Buser,* at p. 643.)

Where, as here, the proceedings are completed within one day, a statement of decision may be made orally on the record and the formalities mother highlights are not required.  (Code Civ. Proc., § 632; Cal. Rules of Court, rule 3.1590(n).)  In this situation, the difference between the statement of decision and statement of reasons may be less stark.  In any event, the comprehensiveness of the statement of reasons would bear on whether a failure to issue a requested statement of decision was harmless error.  (See *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1102, 1116 [failure to issue statement of decision not reversible per se; error harmless where judgment sufficiently addressed issues.)

19

visitation award in proceedings involving allegations of domestic violence. (See, e.g., § 3031, subd. (c) ['When making an order for custody or visitation in a case in which domestic violence is alleged and an emergency protective order, protective order, or other restraining order has been issued, the court shall consider whether the best interest of the child, based upon the circumstances of the case, requires that any custody or visitation arrangement shall be limited to situations in which a third person, specified by the court, is present, or whether custody or visitation shall be suspended or denied']; § 3100.)  The court also may hear a request from [father] to modify custody subject to section 3044's presumption." (*Celia S.,* at pp. 664–665.)

## DISPOSITION

The order granting mother sole legal and physical custody is affirmed. The visitation order is reversed.  The matter is remanded for reconsideration of the visitation order and consideration of any motions for modification, consistent with the views expressed in this opinion.

_____
Kline, J.*


We concur:


_____
Richman, Acting P.J.


_____
Miller, J.


*City and County of San Francisco v. [H.H.]* (A161503)


&ast;Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>      Plaintiff,<br><br>v.<br><br>H.H.,<br><br>      Defendant and Respondent;<br><br>A.M.,<br><br>      Intervener and Appellant. | A161503<br><br>(San Francisco County Super. Ct. No. FCS-15-351235)<br><br>**ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion filed herein on February 17, 2022, be modified as follows: Pursuant to rules 8.90(b)(1), (10) and (11) of the California Rules of Court, that parties be identified in this family law case by initials only. All names in the opinion, including the caption of this opinion are ordered suppressed.

The unpublished opinion in the above-entitled matter filed on February 17, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be certified for publication in the Official Reports. There is no change in judgment.


Date: _____                    _____

                                                    Richman, Acting P.J.

Trial Court:                                San Francisco County Superior Court

Trial Judge:                            Hon. Victor H. Hwang

Attorney for Appellant:          Wilmer Cutler Pickeling Hale & Darr
Thomas G. Sprankling
Mark D. Flanagan
Melissa A. McCall

Bay Area Legal Aid
Fawn Jade Korr
Sarah Jacobvitz

Family Violence Appellate Project
Cory D. Hernandez
Jennafer Dorfman Wagner
Erin Smith

Amici Curiae A Safe Place, Center for the Pacific Asian Family, Equal Justice Society, My Sister's House, Young Women's Freedom Center:

Equal Justice Society
Christina A. Alvernaz
Eva Jefferson Paterson
Rau M. Tawatao

No Appearance for Respondent